David **MESHEL**, et al., Appellants,

v.

**OHEV SHOLOM TALMUD TORAH,**
et al., Appellee.

No. 03–CV–952.

District of Columbia Court of Appeals.

Argued Dec. 15, 2004.

Decided March 10, 2005.

Jesse A. Witten, Washington, with whom David Felsen was on the brief, for appellants.

David Epstein for appellees.

Nathan J. Diament filed an amicus curiae brief for The Institute for Public Affairs of the Union of Orthodox Jewish Congregations of America, in support of appellants.

Barton D. Moorstein, Abba Cohen, David Zwiebel, and Mordechai Biser filed an amicus curiae brief for Agudath Israel of America, in support of appellants.

Before SCHWELB and WASHINGTON, Associate Judges, and KRAVITZ, Associate Judge, Superior Court of the District of Columbia.*

KRAVITZ, Associate Judge:

A provision in the corporate bylaws of an Orthodox Jewish congregation organized under District of Columbia law provides that any claim of a member against the congregation that cannot be amicably resolved shall be referred to a "Beth Din" of Orthodox Jewish rabbis for a binding decision according to Jewish law. Three members of the congregation invoked this provision and sought a Beth Din to resolve an internal dispute concerning the governing structure of the congregation and the ownership of its property. When the congregation refused to participate in a Beth Din, the three members brought an action in the trial court pursuant to the District of Columbia Uniform Arbitration Act seeking an order compelling the congregation and a private organization alleged to be its alter ego to submit to binding arbitration before a Beth Din as required by the bylaws.

The congregation and its alleged alter ego filed a motion to dismiss the action for lack of subject matter jurisdiction on the ground that the religion clauses of the First Amendment precluded the trial court from determining whether the Beth Din provision in the bylaws is an agreement to arbitrate subject to judicial enforcement under the Arbitration Act. Finding that it could not resolve the members' action to compel arbitration without impermissibly entangling itself in ecclesiastical matters, the trial court granted the motion to dismiss.

We reverse. We conclude that well-established, neutral principles of contract law can be used to determine whether the Beth Din provision in the bylaws is an enforceable arbitration agreement and, if so, whether the parties' dispute falls within its scope. We therefore hold that the civil courts have jurisdiction consistent with the First Amendment to resolve the action to compel arbitration.

On the merits, we conclude that the Beth Din provision does constitute an enforceable agreement between the congregation and its members to arbitrate their underlying dispute before a Beth Din of Orthodox Jewish rabbis, and we according-

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

ly direct the trial court to compel the congregation to comply with its agreement. As for the private organization alleged to be the congregation's alter ego, we remand to the trial court for findings based upon a further development of the factual record.

## I.

Because a clear understanding of the facts underlying the parties' dispute is necessary to our analysis, we review the facts in detail.

Appellee Ohev Sholom Talmud Torah ("Ohev Sholom") is a religious society incorporated in 1958 pursuant to the District of Columbia Religious Societies Act, D.C.Code § 29–701 et seq. (2001). As set forth in its articles of incorporation, Ohev Sholom's principal purposes are to establish, maintain, and conduct a synagogue and a religious school for children in accordance with the tenets of the traditional Hebrew Orthodox faith and to carry on other religious, educational, and charitable activities consistent with those usually associated with a traditional Orthodox Jewish synagogue and school. Since 1960, Ohev Sholom has owned and operated an Orthodox Jewish synagogue located in the District of Columbia at 7712 Sixteenth Street, N.W.

Ohev Sholom is a stand-alone, "congregational" religious organization. Unlike many churches and other religious entities that operate within "hierarchical" religious organizations and are required, on issues of faith, governance, and worship, to comply with the decisions of higher ecclesiastical authorities within those organizations, Ohev Sholom is a self-governing entity that has no higher ecclesiastical body or authority to which it must answer.

The rights and duties of Ohev Sholom's members, officers, and board of directors are set forth in articles of incorporation

that were filed at the time of Ohev Sholom's organization and in corporate bylaws that were initially adopted in 1959 and subsequently revised in 1966, 1987, and 1996. The bylaws span fifteen single-spaced pages in the record and are divided into sixteen articles entitled "Congregation," "Membership," "Dues," "Death Benefits," "Officers and Duties," "Board of Directors," "Election and Removal of Officers and Directors," "Meetings," "Gabaim," "Rabbi, Cantor, Shamos and Executive Director," "Committees," "Societies," "Amendments," "Life Time Seats," "Cemetary Rules and Regulations," and "Effective Date." The bylaws contain no separate article or section dedicated to general or miscellaneous provisions.

The bylaws leave to the membership of the congregation the power to hire and fire rabbis and other senior staff. Otherwise, however, the bylaws provide that Ohev Sholom's affairs are to be governed by a single board of directors consisting of seven elected officers, twenty-one directors elected by the congregation to staggered three-year terms, all past board presidents, other "life members" elected by the congregation, and two directors appointed by Ohev Sholom's sisterhood. The bylaws entrust custody of all of Ohev Sholom's property to the board of directors and empower the board to enter into contracts on behalf of the congregation. The congregation's seven officers—a president, three vice presidents, a treasurer, a recording secretary, and a financial secretary—are to be elected to one-year terms by the congregation's membership at its annual meeting each May and are to be installed on a date later in May set by the incumbent president. The president of the congregation is to act as the chairman of the board of directors. The bylaws themselves are subject to amendment only by a

two-thirds vote of the congregation's membership.

The bylaws provide that regular meetings of the congregation are to be held at least three times per year, including the annual meeting in May, and that regular meetings of the board of directors are to be held each month on the first Monday of the month that is not a legal or religious holiday. Special meetings of the full congregation or the board of directors may be called by the president. Notice of any meeting of either the congregation or the board must be mailed at least one week in advance of the meeting to all persons eligible to attend, and the purpose of any special meeting must be stated in the notice. No business other than that stated in the notice may be considered at a special meeting of the congregation or the board.

Article II of the bylaws, entitled "Membership," contains thirteen sections. Under the various provisions set forth therein, any person over the age of eighteen who is of the Jewish faith and of good moral character is eligible for membership in Ohev Sholom. Once admitted, a member able to pay regular dues is required to do so, and all members who have paid their dues and are otherwise in good standing are entitled to vote at meetings of the membership of the congregation. Married couples are entitled to a single vote.

Section 12 of Article II, first adopted as part of the 1966 revisions to the bylaws and then maintained through the subsequent revisions in 1987 and 1996, provides a mandatory alternative dispute resolution mechanism for unresolved disputes between members of Ohev Sholom and the congregation:

Any claim of a member against the Congregation which cannot be resolved amicably shall be referred to a Beth Din of Orthodox Rabbis for a Din Torah. The decision of the Beth Din shall be binding on the member and the Congregation. Failure to comply with this provision shall be grounds for disciplinary action.

A Beth Din, interpreted literally as a "house of judgment" or "house of the law," is a panel of rabbis that sits without a jury and decides private disputes through the application of Jewish law, known as Halacha. Jewish law encompasses a broad range of subjects, from matters of religious doctrine and ritual to issues more commonly addressed in the civil courts, such as divorce and other family disputes, disagreements over corporate governance, and conflicts related to contracts and other commercial transactions. It does so because under Jewish law disputes between Jews are, to the extent possible, to be decided by other Jews through the mechanism of a Beth Din. A Din Torah is the judgment of a Beth Din.

Our two *amici curiae* inform us that some Beth Din panels are ad hoc and hear a relatively small number of cases, while others, such as the Beth Din of America, a national organization headquartered in New York, are permanent entities that operate pursuant to detailed procedural rules and hear hundreds of cases each year.[1] Here in the District of Columbia, the Rabbinical Council of Greater Washington is a Beth Din of Orthodox rabbis that is available to arbitrate private disputes in accordance with Jewish law. The record establishes that on two separate occasions, in 1998 and 2001, Ohev Sholom, acting through its board of directors, sought the convening of Beth Dins through

---

1. While we typically do not consider extrajudicial factual information provided by *amici curiae,* the information concerning Beth Dins provided by *amici* here is merely explanatory and illustrative of factual material already in the record.

the Rabbinical Council of Greater Washington to resolve commercial disputes with vendors.

As indicated previously, Ohev Sholom has owned and operated an Orthodox Jewish synagogue in the District of Columbia since 1960. For more than thirty years, the synagogue located at 7712 Sixteenth Street, N.W. was the only synagogue operated by the congregation and was the religious focus of a community made up of well over 100 Orthodox Jewish families living in the area surrounding the synagogue. Nearly all of the members of Ohev Sholom lived close to the synagogue, as Jewish law prohibits the use of automobiles and virtually all other forms of transportation on the Sabbath and on other important days of religious worship.

Apparently due to demographic changes in the neighborhood surrounding the synagogue on Sixteenth Street, the size of Ohev Sholom's membership decreased over time to approximately 100 families, and in 1994 the congregation's board of directors decided to expand into Olney, Maryland, the home of a small but growing community of Orthodox Jews. Ohev Sholom purchased real estate in Olney and opened an Orthodox Jewish synagogue there. Initially supported financially by the congregation and by some of its members who worship at the congregation's Sixteenth Street synagogue, Ohev Sholom's synagogue in Olney has grown in size and now serves as the regular place of worship for approximately fifty Orthodox Jewish families that belong to Ohev Sholom and live in the Olney area. Because of the religious prohibitions on transportation on the Sabbath and High Holy days, there is almost no overlap between the members of Ohev Sholom who worship at the Sixteenth Street synagogue in the District of Columbia and those who worship at the synagogue in Olney.

In 1996, the congregation's board of directors considered a proposal to sell the Sixteenth Street property—believed to be worth millions of dollars—due to its alleged underutilization. The board rejected the proposed sale, but the suggestion that the Sixteenth Street synagogue should be sold for the benefit of the overall financial condition of the congregation generated great mistrust between the Sixteenth Street and Olney members of the congregation. The possible sale of the Sixteenth Street synagogue has been debated in each of Ohev Sholom's elections since 1996, and Leonard Goodman, who worships at the Sixteenth Street synagogue, won five consecutive elections for president from 1997 through 2001 on a platform opposed to the sale of the property.

In the meantime, a non-profit Maryland corporation named Maor, Inc. ("Maor") has assisted Ohev Sholom's efforts to expand the congregation's operations in Olney. In accord with its mission of assisting nascent Jewish communities, Maor has paid for the services of a rabbi for the Olney synagogue and has provided daily operational oversight at the facility.

In 2001, Maor and Ohev Sholom formed a new non-profit Maryland corporation named the Center For Jewish Living In Northern Montgomery County, Inc. ("Center"). As set forth in its bylaws, the Center's stated purpose is to conduct and support activities exclusively for the benefit of Ohev Sholom and Maor, and its board of directors is to have five members, three appointed by Ohev Sholom (two from Ohev Sholom's synagogue in Olney and one from its synagogue on Sixteenth Street) and two by Maor. In April 2001, Ohev Sholom's board of directors voted to transfer Ohev Sholom's real property in Olney to the Center. With the assistance of Maor, the Center is now in the early stages of an expansion project—including a new syna-

gogue and rabbinic residence on the Olney property—with an estimated cost of more than $6 million.

In March 2002, Leonard Goodman, Ohev Sholom's incumbent president, appointed a nominating committee for the congregation's upcoming annual election of officers and directors. The committee consisted of two members of the congregation, one from the Sixteenth Street synagogue and one from the Olney synagogue. The committee reported its nominations in April 2002, and its recommended slate of officers included Goodman for a sixth consecutive term as president and appellant David Meshel, an Olney worshipper, for first vice-president. Goodman circulated the nominating committee's slate of candidates to the congregation's membership in notices dated April 18 and May 3, 2002.

Ohev Sholom held its annual meeting on May 5, 2002. When the slate of officers recommended by the nominating committee was put before the membership, an Olney member, acting pursuant to a provision in the bylaws that permits nominations for officers to be made from the floor at annual meetings, nominated Meshel to run for president against Goodman. Apparently aware that he was going to be nominated from the floor, Meshel followed with a prepared statement seeking election as president. The congregation then voted by secret ballot and elected Meshel by a vote of thirty-two to twenty.

Upset by what he viewed as Meshel's "ambush politics," Goodman and other Sixteenth Street members of the congregation became increasingly concerned that Meshel would use his newly increased influence within the congregation to sell the Sixteenth Street property as a means of financing the congregation's expansion project in Olney. On May 15, 2002, Goodman and two other worshippers from the Sixteenth Street synagogue formed a non-profit corporation in the District of Columbia named the Friends of Ohev Sholom Talmud Torah Congregation ("Friends of Ohev Sholom"). Created for a membership consisting exclusively of the members of Ohev Sholom who worship at the Sixteenth Street synagogue, Friends of Ohev Sholom is, pursuant to its bylaws, to be governed by a board of directors elected solely by its membership, i.e., solely by the members of Ohev Sholom who worship at the Sixteenth Street synagogue. The bylaws of Friends of Ohev Sholom provide that the corporation is to be operated in accordance with the requirements of Jewish law and strict Orthodox Jewish tradition. The bylaws, however, do not require the submission of disputes to a Beth Din; rather, they provide that any dispute concerning the proper interpretation of Jewish law is to be resolved by the officiating rabbi of the Sixteenth Street synagogue.

Goodman did not set a date in May 2002 for Meshel to take over as president of Ohev Sholom, as contemplated by the congregation's bylaws. Instead, still acting as president himself, Goodman called a special meeting of Ohev Sholom's board of directors for 10:00 a.m. on Tuesday, May 28, 2002. Goodman mailed a notice on May 20, 2002 to all members of the board stating that the purpose of the special meeting was to "address issues regarding the working relationship between the Sixteenth Street and Olney synagogues," including "proposals regarding this transition."

One day later, on May 21, 2002, Meshel wrote a letter to the entire membership of Ohev Sholom. The record does not reflect whether Meshel had yet received Goodman's notice of the upcoming special meeting of the board of directors. However, after acknowledging that his recent election had pained many members of the congregation who had hoped to see Good-

man continue as president, Meshel sought to reassure members of the congregation who worshipped at the Sixteenth Street synagogue that he had no plan to sell the Sixteenth Street property and that rumors to the contrary were unfounded. "[M]y vision is to see the regeneration of an active and growing membership in our [Sixteenth] Street building with daily, Shabbat and Holiday minions as a centerpiece of our congregation's presence in and service to our Nation's Capital."

Eighteen members of the board of directors attended the board's special meeting on May 28, 2002. Several other members of the board who worship at the Olney synagogue were absent from the meeting, allegedly due to the last-minute nature and innocuous wording of Goodman's notice and to his scheduling of the meeting in the middle of the first workday following Memorial Day.

At the special meeting, Goodman described Meshel's recent election as a "sham" and stated that members of the congregation who worship at the Sixteenth Street synagogue had lost trust in the Olney membership and were very concerned that the Sixteenth Street property, and its possible sale, now would pose too great a temptation to Meshel and others in the Olney membership as they sought to realize their ambitious plans for growth and expansion. Stressing the importance of local control of both synagogues, and citing as precedent the board's 2001 transfer of the congregation's property in Olney to the Center For Jewish Living In Northern Montgomery County, Inc., Goodman proposed that the board adopt a resolution approving the establishment of Friends of Ohev Sholom, vesting the power to select the rabbi for the Sixteenth Street synagogue in Friends of Ohev Sholom, and transferring ownership of the congregation's Sixteenth Street synagogue and all of its related real and personal property to Friends of Ohev Sholom for no consideration.

Several members of the board present at the special meeting on May 28, 2002 objected to the resolution proposed by Goodman on the grounds that the notice mailed out on May 20, 2002 provided an inadequate description of the purpose of the meeting and that the congregation's bylaws did not authorize the board to transfer the congregation's property. The resolution nevertheless passed by a vote of twelve to six, and later that same day, May 28, 2002, Goodman, still acting in his role as president of the congregation and chairman of the board of directors, caused title to the Sixteenth Street property to be transferred to Friends of Ohev Sholom.

Meshel swore himself in as president of Ohev Sholom on June 1, 2002. On June 13, 2002, an attorney working at his behest sent a letter to all 2001–2002 and 2002–2003 members of the Ohev Sholom board of directors stating that the transfer of the Sixteenth Street synagogue to Friends of Ohev Sholom was illegal and accusing Goodman and the board members who voted to adopt the May 28, 2002 board resolution of a breach of fiduciary duty. Meshel's attorney demanded that the board effect the return of the property transferred on May 28, 2002 and that Friends of Ohev Sholom be dissolved.

The board of directors of Ohev Sholom did not comply with the demands of Meshel's attorney, as Meshel apparently never gained majority support among the members of the board. Meshel accordingly decided to call a special meeting of the congregation's membership to address the transfer of the Sixteenth Street property. At the meeting, held on October 17, 2002, the membership of the congregation adopted by a vote of twenty to sixteen a resolution declaring the May 28, 2002 reso-

lution of the board of directors "null and void" and directing Meshel and the board to take all steps necessary to recover the Sixteenth Street property from Friends of Ohev Sholom.

The board of directors of Ohev Sholom held a regular monthly meeting on November 4, 2002. By a majority vote not specified in the record, the board, apparently still controlled by directors who worship at the Sixteenth Street synagogue, adopted a resolution in which it declared that the resolution adopted at the congregation's membership meeting on October 17, 2002 was of "no force or effect." The resolution adopted by the board on November 4, 2002 then went on to dissolve Ohev Sholom's board of directors and to create two new and separate boards of directors, one to govern Ohev Sholom's affairs and property in the District of Columbia, and the other to govern the congregation's affairs and property in Olney. The resolution provided further that the congregation's assets were to be divided between the two synagogues and that interim officers identified in the resolution were to have control of the synagogues' respective assets until special elections could be held.

Meshel and fellow appellants Issadore Gittleson and Tony Gilburt wrote a joint letter to Ohev Sholom on December 17, 2002. Gittleson, who passed away during the pendency of this appeal, was a life member of the Ohev Sholom board of directors who worshipped at the Sixteenth Street synagogue. Gilburt is a member of the congregation who, like Meshel, worships at the synagogue in Olney. Meshel, Gittleson, and Gilburt sent copies of their letter to all 2001–2002 and 2002–2003 members of the Ohev Sholom board of directors and to all members of the board of directors of Friends of Ohev Sholom.

Appellants contended in their letter that in the wake of the May 2002 election the Ohev Sholom board of directors had perpetrated a succession of improper acts that had damaged the congregation and fundamentally altered its governing structure, all in derogation of the rights of members of the congregation guaranteed by the bylaws. Specifically, appellants alleged that the notice Goodman sent out in advance of the May 28, 2002 special meeting of the board of directors did not clearly state the purpose of the meeting, as required by the bylaws. Appellants alleged further that the board lacked authority to transfer the Sixteenth Street property to Friends of Ohev Sholom and that, by effecting the unauthorized transfer, the board had breached its fiduciary duty and its duty of loyalty to the congregation. Finally, appellants alleged that the Sixteenth Street property should have been promptly returned to Ohev Sholom pursuant to the resolution adopted by the membership of the congregation on October 17, 2002 and that the board of directors had no authority, in the absence of a two-thirds vote of the membership amending the bylaws, to alter the governing structure of the congregation as it did in the resolution adopted on November 4, 2002. Invoking Article II, Section 12 of Ohev Sholom's bylaws, Meshel, Gittleson, and Gilburt asked all parties involved to submit the dispute to a Beth Din for resolution.

Goodman and four other members of the congregation who worship at the Sixteenth Street synagogue sent a written response to Meshel, Gittleson, and Gilburt on or about December 26, 2002. Describing appellants' allegations as "worthless," Goodman and the others declined to appear before a Beth Din.

On January 24, 2003, Meshel, Gittleson, and Gilburt brought an action in the Superior Court pursuant to the District of Columbia Uniform Arbitration Act, D.C.Code § 16–4301 *et seq.* (2001), against Ohev Sho-

lom and Friends of Ohev Sholom. Asserting that Article II, Section 12 of Ohev Sholom's bylaws is an enforceable arbitration agreement between Ohev Sholom and its members, appellants moved the court to compel Ohev Sholom and Friends of Ohev Sholom—alleged to be Ohev Sholom's alter ego—to submit to binding arbitration before a Beth Din. *See* Super. Ct. Civ. R. 70–I (requiring that an application to the Superior Court to compel or stay an arbitration or to vacate, affirm, or modify an arbitration award be made by motion).

Appellees Ohev Sholom and Friends of Ohev Sholom filed a motion to dismiss the action for lack of subject matter jurisdiction. *See* Super. Ct. Civ. R. 12(b)(1). Arguing that resolution of the motion to compel arbitration would require the court to intervene in a religious dispute within a religious organization, appellees contended that the religion clauses of the First Amendment precluded the court from asserting jurisdiction to determine whether Article II, Section 12 of Ohev Sholom's bylaws is an enforceable arbitration agreement and, if so, whether the parties' dispute falls within its scope.

The trial court issued a written order on July 23, 2003 granting appellees' motion to dismiss. The trial court stated that it could not determine whether the Beth Din provision in the bylaws is an enforceable arbitration agreement without delving into the religious practices of Ohev Sholom, determining the proper definition of a Beth Din, and otherwise interpreting Orthodox Jewish law. The trial court accordingly concluded that it was barred by the First Amendment from asserting jurisdiction, and it dismissed the case without reaching the merits of appellants' motion to compel arbitration.

Meshel, Gittleson, and Gilburt filed a timely notice of appeal.

## II.

We review the decision of the trial court *de novo,* as the issue of subject matter jurisdiction is a question of law. *Heard v. Johnson,* 810 A.2d 871, 877 (D.C. 2002); *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington, D.C. v. Beards,* 680 A.2d 419, 427 (D.C.1996). We turn first to the controlling constitutional principles.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. These "religion clauses," referred to, respectively, as the Establishment Clause and the Free Exercise Clause, severely circumscribe the role that civil courts may play in the resolution of disputes involving religious organizations. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Because judicial intrusion in religious disputes can advance religion or otherwise impermissibly entangle the civil courts in ecclesiastical matters, *see Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Establishment Clause precludes civil courts from resolving disputes involving religious organizations whenever such disputes affect religious doctrine or church polity or administration, *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich,* 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). The Free Exercise Clause requires civil courts to defer to the decisions of the highest tribunals of hierarchical religious organizations on matters of religious doctrine, discipline, faith, and ecclesiastical rule, custom, or law, *Kedroff v. Saint Nicholas Cathedral of the Russian Ortho-*

*dox Church in North America,* 344 U.S. 94, 115, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *see also Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 727, 20 L.Ed. 666 (1900), and to give equal deference to decisions on ecclesiastical matters reached by congregational religious organizations, *Heard, supra,* 810 A.2d at 879 n. 4.

The First Amendment, however, does not absolutely bar civil courts from reviewing the actions of religious organizations. *Bible Way Church, supra,* 680 A.2d at 427. As we have recognized, "the church is not above the law," *United Methodist Church v. White,* 571 A.2d 790, 795 (D.C.1990), and there are occasions on which civil courts may address the activities of religious organizations without violating the First Amendment. *Bible Way Church, supra,* 680 A.2d at 427. Specifically, civil courts may resolve disputes involving religious organizations as long as the courts employ "neutral principles of law" and their decisions are not premised upon their "consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (citing *Maryland & Va. Churches v. Sharpsburg Church,* 396 U.S. 367, 368, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring)). Even where the civil courts must examine religious documents in reaching their decisions, the "neutral principles" approach avoids prohibited entanglement in questions of religious doctrine, polity, and practice by relying "exclusively upon objective, well-established concepts" of law that are familiar to lawyers and judges. *Jones v. Wolf, supra,* 443 U.S. at 603, 99 S.Ct. 3020. The neutral principles approach is thereby "completely secular in operation." *Id.*

We are fully satisfied that a civil court can resolve appellants' action to compel arbitration according to objective, well-established, neutral principles of law. Although the underlying dispute between the parties goes to the heart of the governing structure of Ohev Sholom and therefore may be beyond the jurisdiction of a civil court, the resolution of appellants' action to compel arbitration will not require the civil court to determine, or even address, any aspect of the parties' underlying dispute. Instead, the court will have to do no more than make the two findings that are required any time a court considers an action to compel arbitration pursuant to the District of Columbia Uniform Arbitration Act—namely, whether the parties have an enforceable agreement to arbitrate and, if so, whether the underlying dispute between the parties falls within the scope of the agreement. *See Carter v. Cathedral Ave. Coop., Inc.,* 566 A.2d 716, 717–19 (D.C.1989); D.C.Code §§ 16–4301, 16–4302(a) (2001). Each of these determinations is governed by traditional principles of contract law, *American Fed'n of Gov't Employees, Local 3721 v. District of Columbia,* 563 A.2d 361, 362 (D.C.1989), principles that are not only objective and well-established but entirely secular in nature and eminently familiar to lawyers and civil court judges alike.

Appellees nevertheless contend that a civil court's consideration of appellants' action to compel arbitration will impermissibly entangle the court in ecclesiastical matters because the court will have to interpret religious terms such as "Beth Din," "Din Torah," and "Orthodox rabbis." We are not persuaded by this argument. There is no material dispute between the parties over the meaning of any of these terms, and it is apparent from the record that all of the parties well understand that a Beth Din of Orthodox rabbis is a panel of Orthodox Jewish rabbis that sits without a jury and renders decisions—known as "Din Torahs"—in private disputes through

the application of Jewish law. Indeed, the record establishes that on two occasions since 1998 Ohev Sholom itself has sought Beth Dins to resolve commercial disputes with vendors and has referred the disputes to the Rabbinical Council of Greater Washington, a Beth Din of Orthodox Jewish rabbis to which appellants are willing to submit the dispute underlying this action. A civil court therefore can adjudicate appellants' action to compel arbitration without having to interpret religious terms such as "Beth Din," "Din Torah," and "Orthodox rabbis."

■ In *Williams v. Board of Trustees of Mount Jezreel Baptist Church*, 589 A.2d 901, 908 (D.C.1991), we cited the rules of statutory construction as examples of the objective, well-established, "neutral principles of law" that civil courts may apply, consistently with the First Amendment, in resolving disputes involving religious organizations. Because the closely analogous rules that govern the formation, interpretation, and enforcement of contracts are no less objective, well-established, or neutral than the rules of statutory construction, we conclude that they, too, are "neutral principles of law" that may be employed by civil courts charged with the resolution of disputes involving religious organizations.

■ We reach the same conclusion concerning the rules by which civil courts determine whether one entity is bound by another's agreement as its "alter ego," an issue we must address as to Friends of Ohev Sholom given our determination, *infra*, that Article II, Section 12 of Ohev Sholom's bylaws constitutes an enforceable agreement to arbitrate disputes between the congregation and its members. It is well established that one seeking to pierce the corporate veil on an alter ego theory must prove by affirmative evidence the existence of a "unity of ownership and interest" and the "use of the corporate form to perpetuate fraud or wrong." *Lawlor v. District of Columbia*, 758 A.2d 964, 975 (D.C.2000); *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C.1984). Although no single factor is dispositive in determining whether the two necessary elements have been proved, courts are required to consider a range of factors, including whether corporate formalities have been observed; whether there has been any commingling of corporate and shareholder funds, staff, and property; whether a single shareholder dominates the corporation; whether the corporation is adequately capitalized; and, especially, whether the corporate form has been used to effectuate a fraud. *Lawlor, supra*, 758 A.2d at 975; *Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 249 n. 22 (D.C.1993); *Vuitch, supra*, 482 A.2d at 816. Like the rules of statutory construction and those governing the formation, interpretation, and enforcement of contracts, all of the factors to be considered in determining whether one entity is the alter ego of another are entirely secular in nature and utterly devoid of religious content. Because they also are objective, firmly established in our case law, and familiar to civil court judges and lawyers, we conclude that they are "neutral principles of law" that civil courts may apply, in accord with the First Amendment, in resolving disputes involving religious organizations.

The result we reach today flows directly from our prior decision in *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419 (D.C.1996). There, church members brought a negligence action against the church over its alleged failure to account for church funds and to issue financial reports to members. We held that the First Amendment precluded a civil court from resolving the negligence

claim because the determination of whether particular accounting and reporting methods advanced by the plaintiffs constituted the prevailing standard of care would require the court to decide whether the church should apply those methods. As that determination necessarily would involve the court in matters of ecclesiastical judgment relating, for example, to the church's collection, tithing, and offering practices and to the pastors' discretionary funds, we concluded that a civil court could not resolve the dispute without impermissibly entangling itself in doctrinal interpretations. *Id.* at 428–31. We stressed, however, that a civil court would be able to apply clear, objective accounting and reporting criteria to church financial practices without implicating church doctrine if (1) those criteria were indisputably applicable to all churches or (2) the church had itself adopted them. "In either circumstance," we said, "the court would not have a role in deciding what principles apply to the church; the court merely would be asked to apply, without ecclesiastical judgment or intrusion, a previously prescribed, authoritative, nondiscretionary—and clear—policy." *Id.* at 428.

Appellants' action to compel arbitration fits neatly within the second of the two categories of circumstances identified in *Bible Way Church* in which a civil court may properly apply clear and objective criteria to the practices of a religious organization. Through its corporate bylaws, Ohev Sholom and its members have formally adopted the Beth Din as their alternative dispute resolution mechanism of choice for disputes between members and the congregation. A civil court considering an action to compel arbitration therefore need not decide whether the religious forum of a Beth Din should be used for the extrajudicial resolution of disputes between the congregation and its members. The congregation and its members have

already decided that question in the affirmative, thereby leaving the civil court free to "apply, without ecclesiastical judgment or intrusion, a previously prescribed, authoritative, nondiscretionary—and clear—policy." *Id.*

Our decision in *Bible Way Church* also stands for the proposition that in determining whether the adjudication of an action would require a civil court to stray impermissibly into ecclesiastical matters, we look not at the label placed on the action but at the actual issues the court has been asked to decide. The claim in *Bible Way Church* was one of negligent accounting principles, a cause of action with a distinctly secular sound to it. Yet when we looked behind the label, we determined that a church's accounting principles involve core ecclesiastical matters, such as the church's collection, tithing, and offering practices, that raise questions of internal church governance, are often based upon the application of church doctrine, and are therefore beyond the subject matter jurisdiction of the civil courts. *Bible Way Church, supra,* 680 A.2d at 429.

We employed a similar analysis in *Heard v. Johnson,* 810 A.2d 871 (D.C. 2002). In that case, a defrocked pastor brought a defamation action against his former church, alleging that the church had defamed him through the publication of an 85-page manual documenting its grievances against him and the reasons for his dismissal. As in *Bible Way Church,* we recognized that although the term "defamation" sounded secular, we must look behind the label at the actual issues the court had been asked to decide. Our consideration of the actual issues in dispute led us to conclude that by adjudicating the defamation claim a civil court would have to conduct an inquiry into the bases for the church's decision to dismiss the pastor—a matter at the core of the church's

constitutionally protected authority to make judgments about the clergy and other ecclesiastical matters without government interference. We accordingly held that the defamation claim fell outside the trial court's subject matter jurisdiction despite its secular sounding label. *Heard, supra,* 810 A.2d at 882–85.

The case now before us presents the converse of *Bible Way Church* and *Heard.* It is undeniable that "Beth Din," "Din Torah," "Orthodox rabbi," and "Halacha" are religious terms that lend the case a certain surface feel of ecclesiastical content. When we look beneath the surface, however, we see an action to compel arbitration that turns not on ecclesiastical matters but on questions of contract interpretation that can be answered exclusively through the objective application of well-established, neutral principles of law. In this way, the case now before us hews closely to our decision in *Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch., Inc.,* 514 A.2d 1152 (D.C.1986), a case in which we considered whether a civil court had jurisdiction to resolve an action brought by students and parents to challenge a religious organization's decision to close its religious schools. Although we recognized, as we do here, that the dispute between the parties had an appearance of religious content, we determined that the dispute could be resolved solely through the application of "familiar corporate and trust principles of law." *Id.* at 1156–57.

We note that the cases through which the Supreme Court has developed the "neutral principles of law" doctrine all have arisen from disputes over the ownership or control of church property. *See, e.g., Jones v. Wolf, supra,* 443 U.S. at 597–99, 99 S.Ct. 3020 (dispute between two factions of a church's congregation over the ownership of church property); *Presbyterian Church in the United States, supra,* 393 U.S. at 441–44, 89 S.Ct. 601 (dispute between two local churches and their hierarchical church organization over the ownership of the property of the local churches). Although no party has raised this point here, one judge of the United States District Court for the District of Columbia has inferred from this history that the "neutral principles of law" doctrine applies only in the context of church property disputes. *Burgess v. Rock Creek Baptist Church,* 734 F.Supp. 30, 32 (D.D.C. 1990) (citing *Hutchison v. Thomas,* 789 F.2d 392, 396 (6th Cir.1986)). As our decisions in *Bible Way Church* and *Heard* make clear, however, we have never taken such a restrictive view of the applicability of the "neutral principles of law" doctrine, and we have readily applied its constitutionally required analysis to disputes involving claims of negligent accounting and defamation. More important, we can think of no legitimate reason why the Establishment Clause would permit civil courts to resolve property disputes, but not others, according to objective, well-established, and purely secular legal principles. There is nothing about church property disputes that makes them uniquely susceptible to judicial resolution through the application of neutral principles of law.

Appellees argue as an alternative to their entanglement theory that a civil court's order compelling arbitration before a Beth Din would "advance religion" in violation of the Establishment Clause. *See Lemon v. Kurtzman, supra,* 403 U.S. at 612–13, 91 S.Ct. 2105. Specifically, appellees argue that an order requiring Ohev Sholom to submit the parties' dispute to a Beth Din—a Jewish court presided over by rabbis—would advance the Jewish religion by enforcing the requirement in Jewish law that Jews seek Jewish courts to decide disputes with other Jews.

This argument finds no support in the record. Nowhere in their filings in either this court or the trial court have Meshel, Gittleson, and Gilburt cited a single tenet of the Jewish religion in support of their request for an order compelling arbitration. Appellants' action to compel arbitration is instead premised exclusively upon what appellants contend is the enforceable contractual agreement to arbitrate contained in Article II, Section 12 of Ohev Sholom's bylaws. Appellants' action is to enforce a contractual obligation; its success will not advance the Jewish religion.

To our knowledge, only one other appellate court has expressly addressed the question of whether the First Amendment precludes a civil court from enforcing an agreement to submit a dispute to a Beth Din. In *Avitzur v. Avitzur*, 58 N.Y.2d 108, 459 N.Y.S.2d 572, 446 N.E.2d 136, 138–39 (1983), the New York Court of Appeals held that a civil court did not impermissibly entangle itself in ecclesiastical matters through the enforcement of a provision in a Ketubah (a Jewish marriage contract) that recognized a Beth Din as having authority to counsel the parties in matters concerning their marriage. Just as we do here, the court reasoned that it was simply interpreting the Beth Din provision in the marriage contract according to neutral principles of contract law and that doing so did not implicate any issue of Jewish religious doctrine.[2]

The case before us presents an even stronger claim for the application of "neutral principles of law" than that presented in *Avitzur*. There, the court concluded that it could consider the enforceability of the agreement to refer disputes relating to the parties' marriage to a Beth Din even though the agreement was contained within a religious document, the Ketubah. Here, the agreement to refer disputes to a Beth Din is contained within Ohev Sholom's bylaws, a secular corporate document adopted by the members of Ohev Sholom pursuant to District of Columbia law.

Appellees' final argument in support of its position that the First Amendment bars a civil court from adjudicating appellants' action to compel arbitration is that the members of Ohev Sholom who worship at the Sixteenth Street synagogue have the right under the Free Exercise Clause to look to their rabbi to determine whether the Beth Din provision in the congrega-

**2.** At least four other state appellate courts also have found agreements to submit disputes to Beth Dins enforceable under state laws in their respective jurisdictions, *see Dial 800 v. Fesbinder*, 118 Cal.App.4th 32, 12 Cal. Rptr.3d 711, 721–24 (2004); *Ghertner v. Solaimani*, 254 Ga.App. 821, 563 S.E.2d 878, 879 (2002); *In re Marriage of Popack*, 998 P.2d 464, 466–67 (Colo.Ct.App.2000); *Blitz v. Beth Isaac Adas Israel Congregation*, 352 Md. 31, 720 A.2d 912, 913 (1998), and we have considered whether we can properly rely upon their decisions in support of our First Amendment analysis. None of these other appellate courts, however, has expressly addressed the question of whether a civil court can enforce an agreement to submit a dispute to a Beth Din without running afoul of the First Amendment. While case law in three of the states suggests that actions are to be dismissed whenever it appears that subject matter jurisdiction is lacking, even if the issue has not been raised by any of the parties, *see People v. J.M.*, 854 P.2d 1346, 1350 (Colo.Ct. App.1992); *Brown v. Rock*, 184 Ga.App. 699, 362 S.E.2d 480, 481 (1987); *Duffy v. Conaway*, 295 Md. 242, 455 A.2d 955, 961 n. 8 (1983), and while in the fourth state a lack of subject matter jurisdiction has been deemed a basic defect that can be raised at any time, *see Barnick v. Longs Drug Stores, Inc.*, 203 Cal. App.3d 377, 250 Cal.Rptr. 10, 11–12 (1988), we are reluctant, in the absence of any affirmative discussion of the First Amendment issue, to draw any conclusions concerning our own subject matter jurisdiction from the fact that appellate courts in California, Georgia, Colorado, and Maryland have reached the merits of actions to enforce agreements to submit disputes to Beth Dins.

tion's bylaws applies to the parties' underlying dispute. According to appellees, Orthodox Jewish law provides that the rabbi, not a Beth Din, is the highest religious authority within a congregation.

We reject this argument. First, there is no indication in the record that Goodman or any of the others who declined appellants' request to submit the parties' underlying dispute to a Beth Din ever even spoke with the rabbi of the Sixteenth Street synagogue about the possibility of going before a Beth Din. Second, although appellees are correct that the Beth Din is not the highest religious authority within Ohev Sholom—a self-governing "congregational" religious organization that contains no internally operated Beth Din—appellants have not asked that a Beth Din determine whether Article II, Section 12 of Ohev Sholom's bylaws applies to the parties' underlying dispute. To the contrary, appellants have invoked the District of Columbia Uniform Arbitration Act and asked the civil courts to enforce the congregation's bylaws through the objective application of well-established, neutral principles of contract law.

Indeed, we agree with appellants that it is they, as members of Ohev Sholom, whose free exercise rights would be infringed were a civil court to determine that Article II, Section 12 of the congregation's bylaws is an agreement to arbitrate within the meaning of the District of Columbia Uniform Arbitration Act but then decline to enforce the agreement. Acting through its members, Ohev Sholom formally adopted the Beth Din provision as part of its bylaws back in 1966, and the congregation, its members, and their successors

have maintained the provision as part of the organization's fundamental operating structure ever since. In our view, this is precisely the type of ecclesiastical decision by a congregational religious organization that, as we determined in *Heard, supra,* 810 A.2d at 879 n. 4, is due the same judicial deference under the Free Exercise Clause as a decision of the highest tribunal of a hierarchical religious organization on a matter of religious doctrine, discipline, faith, or ecclesiastical rule, custom, or law. *See Kedroff, supra,* 344 U.S. at 115–16, 73 S.Ct. 143; *Watson, supra,* 80 U.S. at 727. As we stated in *Heard, supra,* 810 A.2d at 879 n. 4, the internal structure of a congregational religious organization "provides no nuance that would change its standing under the First Amendment or that would require a different constitutional analysis from that afforded to a hierarchical [religious organization]."

We hold, accordingly, that the religion clauses of the First Amendment do not divest the civil courts of subject matter jurisdiction to adjudicate appellants' action to compel arbitration,[3] and we now proceed to the merits of that action.

### III.

Appellants seek an order compelling appellees to submit the parties' underlying dispute to a Beth Din of Orthodox Jewish rabbis for a binding decision according to Jewish law. Appellants argue that Article II, Section 12 of Ohev Sholom's bylaws is an agreement to arbitrate within the meaning of the District of Columbia Uniform Arbitration Act; that the parties' dispute falls within the scope of the agreement to arbitrate; and that Friends of

---

**3.** We take no position concerning whether a civil court would have subject matter jurisdiction consistent with the First Amendment to adjudicate a subsequent action to confirm, modify, correct, or vacate the decision of a

Beth Din. *See* D.C.Code §§ 16–4312 (2001) (addressing the confirmation, modification, and/or correction of an arbitrator's award); 16–4311 (2001)(addressing the vacation of an award).

Ohev Sholom, as Ohev Sholom's alter ego, is bound by the terms of the agreement.

Appellees oppose the action to compel arbitration on several grounds. Appellees contend that the Arbitration Act does not apply retroactively to the Beth Din provision in Ohev Sholom's bylaws; that the Beth Din provision is not an agreement to arbitrate within the meaning of the Arbitration Act; and that, even if it is, the parties' underlying dispute falls outside its scope. Appellees contend further that Friends of Ohev Sholom cannot be compelled to submit to arbitration before a Beth Din because its own corporate bylaws contain no Beth Din provision and because it is not Ohev Sholom's alter ego.

We address each of the parties' contentions in turn.

▮▮▮▮ First, as to the applicability of the District of Columbia Uniform Arbitration Act, the Act expressly provides that it "shall only apply to agreements [to arbitrate] made subsequent to its enactment." D.C.Code § 16–4318 (2001). Appellees argue that the Arbitration Act cannot be applied retroactively to provide a statutory basis for appellants' action to compel arbitration because Ohev Sholom adopted the Beth Din provision in its bylaws in 1966, eleven years before the enactment of the Arbitration Act in 1977.

The record refutes the factual premise of appellees' argument. The version of Ohev Sholom's bylaws that appellees themselves submitted in the trial court establishes that the congregation reviewed and approved revisions to the bylaws in 1987 and 1996 and that the Beth Din provision set forth in Article II, Section 12—adopted initially as part of a set of revisions approved in 1966—was retained through both subsequent revisions. We view the congregation's retention of the Beth Din provision through the 1987 and 1996 revisions as two separate acts of ratification of the provision. Indeed, we agree with the decisions of courts in Maine and Illinois that each day a person remains a member of an organization is properly considered an implicit reaffirmation of the person's agreement to adhere to the organization's bylaws. *See Maine Central R.R. Co. v. Bangor & Aroostook R.R. Co.*, 395 A.2d 1107, 1120–21 (Me.1978); *Johnson v. Schuberth*, 40 Ill.App.2d 467, 189 N.E.2d 768, 772 (1963). We therefore conclude that the Beth Din provision set forth in Article II, Section 12 of Ohev Sholom's bylaws was "made subsequent to [the] enactment" of the Arbitration Act within the meaning of D.C.Code § 16–4318 (2001) and that the Arbitration Act is fully applicable to appellants' action to compel arbitration.

▮▮▮▮ As to whether Article II, Section 12 of Ohev Sholom's bylaws is an enforceable agreement to arbitrate the parties' underlying dispute, the Arbitration Act provides the following statutory framework:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract. D.C.Code § 16–4301 (2001).

On application of a party showing an agreement described in section 16–4301, and the opposing party's refusal to arbitrate, the Court shall order the parties to proceed with arbitration, but if [the] opposing party denies the existence of the agreement to arbitrate the Court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied. D.C.Code § 16–4302(a) (2001).

As discussed above, D.C.Code §§ 16–4301 and 16–4302(a) require a court considering an action to compel arbitration to determine, according to traditional principles of contract law, whether the parties have an enforceable agreement to arbitrate and, if so, whether the underlying dispute between the parties falls within the scope of the agreement. *See Carter v. Cathedral Ave. Coop., Inc.*, 566 A.2d 716, 717–19 (D.C.1989); *American Fed'n of Gov't Employees, Local 3721 v. District of Columbia*, 563 A.2d 361, 362 (D.C.1989).

■ It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members, *Willens v. Wisconsin Ave. Coop. Ass'n*, 844 A.2d 1126, 1135 (D.C.2004); *Local 31, Nat'l Ass'n of Broadcast Employees & Technicians (AFL–CIO) v. Timberlake*, 409 A.2d 629, 632 (D.C.1979), since the continuing relationship between the organization and its members manifests an implicit agreement by all parties concerned to abide by the bylaws. *Maine Central R.R. Co., supra,* 395 A.2d at 1120–21; *Johnson, supra,* 189 N.E.2d at 772. We thus construe the corporate bylaws of Ohev Sholom as a written contractual agreement between the congregation and its members.

In determining whether Article II, Section 12 of Ohev Sholom's bylaws is an agreement to arbitrate "controvers[ies] thereafter arising between the parties" within the meaning of D.C.Code § 16–4301, we must adhere to the "objective law" of contracts, under which the written language embodying the terms of an agreement governs the rights and liabilities of the parties. *Capital City Mortgage Corp. v. Habana Village Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C.2000). We look first to the actual language of the contract and give that language its plain meaning. *Id.*

Article II, Section 12 provides that it applies to "any claim" of a member against the congregation that "cannot be resolved amicably." It provides further that any such claim "shall" be referred to a Beth Din of Orthodox Jewish rabbis for the issuance of a "Din Torah" and that the Din Torah—or "decision"—"shall be binding on the member and the [c]ongregation." Given the plain meaning of this contractual language, we conclude as a matter of law that Article II, Section 12 of the bylaws clearly and unambiguously sets forth an agreement requiring the congregation and its members to submit "controvers[ies] thereafter arising" between them to binding arbitration before a Beth Din of Orthodox Jewish rabbis.

The absence of the word "arbitration" from Article II, Section 12 is of no legal significance. *See McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830 (2d Cir.1988) (stating that the absence of the word "arbitration" in a contract is "irrelevant" under the federal arbitration act where the parties clearly intend to submit disputes to their chosen instrument for definitive resolution); *Powderly v. Metrabyte Corp.*, 866 F.Supp. 39, 42 (D.Mass.1994) (same). *See generally Hercules & Co. v. Beltway Carpet Serv., Inc.*, 592 A.2d 1069, 1072–73 (D.C.1991) (holding that federal court decisions construing and applying the federal arbitration act may be regarded as persuasive authority in construing and applying corresponding provisions of our local arbitration act). Nor is there a requirement in the District of Columbia Uniform Arbitration Act that an agreement to arbitrate identify a specific person or entity as the arbitrator. *Cf.* D.C.Code § 16–4303 (2001) (addressing the appointment of arbitrators). This is particularly true here,

where the record establishes without any genuine dispute that the parties share the same understanding of a Beth Din as an extrajudicial forum for the binding resolution of disputes between Ohev Sholom and its members.

We next must consider whether the parties' underlying dispute falls within the scope of Article II, Section 12. Once again, we look to the plain meaning of the actual language of the bylaw. That language—requiring the submission to a Beth Din of "any claim" of a member against the congregation that cannot be resolved amicably—is sufficiently broad and all-encompassing to include the underlying disagreements between the parties concerning the governing structure of the congregation, the ownership of its property, and the fiduciary duties of its officers and directors.

Appellees note in this regard that the Beth Din provision is located within Article II of the bylaws, entitled "Membership," rather than in an article that contains general provisions explicitly made applicable to all issues covered by the bylaws. Appellees argue that the Beth Din provision therefore applies only to disputes that relate to membership in the congregation.

This argument lacks merit. By-laws and other contracts are to be "construed as a whole" in a manner consistent with the "clear, simple and unambiguous meaning" of their language. *Willens, supra,* 844 A.2d at 1135 (quoting *Johnson v. Fairfax Village Condo. IV Unit Owners Ass'n,* 548 A.2d 87, 91 (D.C.1988)). Given the plain and unambiguous meaning of the open-ended language of the Beth Din provision and the absence in the bylaws of a separate article or section dedicated to general or miscellaneous provisions, we conclude that Article II, Section 12 of Ohev Sholom's bylaws is not limited to disputes relating to membership in the congregation.

Moreover, we have held repeatedly that a presumption of arbitrability as to any particular dispute arises once the existence of an enforceable agreement to arbitrate has been determined. *See, e.g., Masurovsky v. Green,* 687 A.2d 198, 201–02 (D.C.1996); *Haynes v. Kuder,* 591 A.2d 1286, 1289 (D.C.1991); *Carter, supra,* 566 A.2d at 717. This presumption requires that an action to compel arbitration be sustained "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Carter, supra,* 566 A.2d at 717. Any doubts in this regard are to be "resolved in favor of coverage." *Id.* As it is clear that Article II, Section 12 can be interpreted rationally to include the underlying dispute between the parties here, we hold, as a matter of law, that the parties' dispute falls within the scope of their agreement to arbitrate.

Our decision to enforce the Beth Din provision in Ohev Sholom's bylaws is consistent with every other decision of which we are aware in which an appellate court in a jurisdiction, like ours, that has adopted the Uniform Arbitration Act has addressed the enforceability of an agreement to refer a dispute to a Beth Din. *See In re Marriage of Popack,* 998 P.2d 464, 465–68 (Colo.2000) (holding that an agreement to arbitrate before a Beth Din is enforceable under the Colorado Uniform Arbitration Act as long it is not unconscionable and did not result from duress); *Blitz v. Beth Isaac Adas Israel Congregation,* 352 Md. 31, 720 A.2d 912, 913 n. 1 (1998) (stating that Maryland courts applying the Maryland Uniform Arbitration Act recognize the validity of arbitration proceedings before a Beth Din, even where the proceedings are not in strict compliance with the Act, as long as the parties

knowingly and voluntarily agree to the arbitration procedures). Because the District of Columbia Uniform Arbitration Act expressly provides that it is to be construed in a manner consistent with the law in other states that have adopted the Uniform Arbitration Act, D.C.Code § 16–4319 (2001), we view the decisions of the highest courts of Colorado and Maryland as persuasive authority in support of our conclusion. *See Walter A. Brown, Inc. v. Moylan,* 509 A.2d 98, 99 n. 3 (D.C.1986).[4]

The one remaining issue is whether Friends of Ohev Sholom is bound, as Ohev Sholom's alter ego, by the Beth Din provision set forth in Article II, Section 12 of Ohev Sholom's bylaws. As discussed previously, the resolution of this issue requires a determination of whether a "unity of ownership and interest" exists and of whether "the corporate form [has been used] to perpetuate fraud or wrong." *Lawlor, supra,* 758 A.2d at 975. This determination in turn requires the consideration of a range of factors, including whether corporate formalities have been observed; whether there has been any commingling of corporate and shareholder funds, staff, and property; whether a single shareholder dominates the corporation; whether the corporation is adequately capitalized; and, especially, whether the corporate form has been used to effectuate a fraud. *Id.*

 Appellees argue, as an initial matter, that appellants waived this issue by failing to raise the alter ego theory in the trial court. We conclude that there was no such waiver. Although appellants never used the term "alter ego" in their pleadings in the trial court, they did allege facts

concerning the formation of Friends of Ohev Sholom, its allegedly inappropriate purpose, its alleged control by Goodman and other prominent members of Ohev Sholom who worship at the congregation's Sixteenth Street synagogue, and the manner in which it is alleged to have been used to circumvent the will of the overall membership of the congregation. Those factual allegations were sufficient to preserve the issue for appeal, since "[o]nce a claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Howard Univ. v. Lacy,* 828 A.2d 733, 738 n. 7 (D.C.2003) (quoting *Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992)).

We nevertheless conclude that the record does not contain sufficient factual detail to enable us to perform an informed analysis and proper balancing of the relevant factors. For example, the evidence currently in the record does not permit us to determine with any confidence whether corporate formalities have been observed or whether corporate funds, staff, and property have been commingled. Nor does the evidence currently in the record allow us to determine either the extent to which Goodman and other influential members of the Sixteenth Street synagogue control Friends of Ohev Sholom or the adequacy of the capitalization of that recently created entity. Without further elucidation of the relevant facts, a court cannot make the necessary determinations of whether there truly is a unity of ownership and interest and whether the corporate form has been used to perpetuate fraud or wrong. The

---

4. As discussed previously, appellate courts in New York, California, and Georgia also have held that agreements to submit disputes to Beth Dins are enforceable agreements to arbitrate. *See* note 2, *supra,* and accompanying text. We are not required to consider the decisions of those courts, as they arose in jurisdictions that have not adopted the Uniform Arbitration Act. We nevertheless find them persuasive.

parties therefore must be given an opportunity in the trial court to develop the record further in support of their respective positions on the question of whether Friends of Ohev Sholom is bound, as Ohev Sholom's alter ego, by the Beth Din provision in Ohev Sholom's bylaws.

### IV.

We accordingly reverse the judgment of the trial court and remand with instructions to enter an order compelling Ohev Sholom to submit to a Beth Din of Orthodox Jewish rabbis for binding resolution of the parties' underlying dispute and to determine, following a further development of the factual record, whether Friends of Ohev Sholom also is bound, as Ohev Sholom's alter ego, to submit to binding arbitration before the same Beth Din.

*So ordered.*