*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-1472

ABUNE SAMUEL, APPELLANT,

V.

NEGA LAKEW, ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-9083-12)

(Hon. Neal E. Kravitz, Trial Judge)

(Argued December 9, 2014                    Decided  June 11, 2015)

*Leonard J. Koenick* for appellant.

*Earl N. Mayfield*, with whom *Michael P. Lewis* was on the brief, for appellee.

Before THOMPSON, EASTERLY, and MCLEESE, *Associate Judges*.

THOMPSON, *Associate Judge*:   In December 2012, appellant Abune Samuel, identifying himself as the "duly constituted and appointed Archbishop of the Washington DC area diocese of the Ethiopian Orthodox Tewahedo Churches in the Diaspora[,]" filed a Complaint against appellees Nega Lakew and Tesfaye Nega — identified in the Complaint as, respectively, the President of the Board of Directors

of Kedus Gabriel Ethiopian Orthodox Tewahedo Church ("Kedus Gabriel") and head of the Kedus Gabriel Parish Administrative Council. The Complaint announced that the case "involves control over real property located at 2601 Evarts Street, NE [the "Evarts Street property"] . . . and owned by Kedus Gabriel[.]" The Complaint sought, *inter alia*, the following injunctive relief: that appellees "be directed to forthwith turn over to Archbishop Abune Samuel any and all property belonging to Kedus Gabriel" and that each appellee "cease and desist from holding himself out in any manner as an administrator or member of the Parish Council of Kedus Gabriel[.]"[1] After defendants/appellees Lakew and Nega moved for summary judgment, the trial court (the Honorable Neal Kravitz) dismissed the Complaint, concluding that the court lacked subject matter jurisdiction "to resolve the matter of control of the [Kedus] Gabriel church[.]" In a subsequent order denying appellant's motion to amend the judgment, Judge Kravitz stated that he

---

[1] Appellant also sought a declaratory judgment that he is the "duly appointed Archbishop of the Ethiopian Orthodox Tewahedo Churches in the Diaspora in the control of Kedus Gabriel[,]" and, in his separate complaint in this consolidated action, alleged and sought money damages for wrongful eviction, conversion, and replevin. The trial court denied a defense motion for summary judgment on the wrongful eviction and conversion claims, granted summary judgment on the replevin claim, and dismissed the claims for declaratory and injunctive relief. By order dated March 6, 2014, this court ruled that the instant appeal is "limited to the trial court's dismissal of appellant's claims for injunctive relief."

"remain[ed] of the view . . . that the First Amendment does not permit a civil court to determine the religious leader of a religious institution[.]"

Appellant contends that Judge Kravitz had jurisdiction to make a finding that Kedus Gabriel is part of the hierarchical Ethiopian Orthodox Tewahedo Church in the Diaspora and to grant injunctive relief based on deference to the church hierarchy's decision to remove appellees from their positions as Kedus Gabriel administrators. He asks us to remand this matter for the Superior Court to make "a determination of the true form of the organizational structure of Kedus Gabriel[.]"

For the reasons that follow, we affirm the judgment of dismissal.[2]

## I.  Background

---

[2]  Our review is de novo. *See  Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419, 427 (D.C. 1996) ("The issue of subject matter jurisdiction is a question of law, and thus [our review is] *de novo*."); *Sundberg v. TTR Realty, Inc.*, 109 A.3d 1123, 1128 (D.C. 2015) ("We review *de novo* the dismissal of a complaint . . . for failure to state a claim upon which relief can be granted."); *Johnson v. Washington Gas Light Co.*, 109 A.3d 1118, 1120 (D.C. 2015) ("We review a grant of summary judgment *de novo*[.]").

Political upheaval in Ethiopia in the early 1990s caused a division in the Ethiopian Orthodox Tewahedo Church, the primary religious institution in Ethiopia. The Ethiopian Orthodox Tewahedo Church's original Patriarch, some of its Archbishops, and many other Ethiopians fled to the United States. Some Ethiopians who emigrated to the United States formed Ethiopian Orthodox Tewahedo congregations. Kedus Gabriel, which was incorporated in 1993, is one such congregation. The Patriarch and Archbishops who emigrated to this country formed the Ethiopian Orthodox Tewahedo Church in the Diaspora; its governing body is known as the "Holy Synod."

In 1994, the then-leader of the Ethiopian Orthodox Tewahedo Church in the Diaspora appointed appellant as "priest-in-charge" of Kedus Gabriel. From 1994 until October 2012, appellant's living quarters were provided by Kedus Gabriel. Kedus Gabriel purchased the Evarts Street property on February 17, 2001, and, beginning in July 2001, appellant's living quarters were in the Evarts Street property. Appellant was appointed Archbishop of the Washington Metropolitan area in 2007 by the Patriarch of the Ethiopian Orthodox Tewahedo Church in the Diaspora, Abune Merkorios.

In 2012, a dispute arose between appellant and appellees in their capacity as Kedus Gabriel administrators. We need not describe the background and details of the dispute; it suffices for present purposes to say that a committee appointed by the Holy Synod conducted an ecclesiastical investigation under the leadership of Patriarch Merkorios and determined that appellee Nega and the existing Kedus Gabriel Parish Council members had "no further legal standing and [were] to be replaced under the direction of" appellant. Appellant wrote an October 4, 2012 letter to appellee Nega, describing the committee's decision. The letter recited that the Holy Synod committee had found that appellee Nega and the Parish Council had "broken the laws and traditions of the Church" and had "lost moral standing."[3] The letter explained that, in order to "protect the integrity of the Ethiopian Orthodox Tewahedo Religion Church traditions, enforce the ecclesiastical findings, and protect the spiritual well[-]being of parishioners" and to "ensure that only those whom [appellant] deems to be capable of upholding and maintaining the law and traditions of the Church, and who have not been found to violate the laws and traditions of the Church[,] will be able to stand for election to the Church

---

   [3] The committee appointed by the Holy Synod found that Kedus Gabriel's administrator had "creat[ed] unnecessary provocative arguments with the clergy in and around the Meqdes (innermost part) of the Church" and had been "abusive and disrespectful to fathers of the Church."

Council[,]"[4] appellant had appointed himself Church Administrator (i.e., "the priest who administers the Church"), had removed appellee Nega and all Kedus Gabriel officers from their positions, and had suspended the Kedus Gabriel bylaws. Kedus Gabriel's Board responded by announcing that appellant was terminated, by instructing him to "surrender all keys and properties" of the church and to "leave the premises immediately," and by blocking his access to the Evarts Street property.[5]

---

[4] The committee found that any election the existing Parish Council might propose "would lack spirituality."

[5] Patriarch Merkorios wrote to Kedus Gabriel's Board on October 14, 2012, chastising them for their rebellious behavior and "urg[ing them] to submit to the spiritual paternity and the powers vested in [appellant.]" In addition, in January 2013, Patriarch Merkorios sent a letter to the Kedus Gabriel Board, asserting that he is "the final arbiter, ruler and decision maker in all administrative and spiritual matters involving all Churches . . . in the Diaspora" and asserting that appellant is "the sole principal administrator, decision maker and governor in all spiritual and administrative matters" for Kedus Gabriel.

By contrast, appellee Lakew asserted in his declaration, submitted in support of appellees' summary judgment motion, that Kedus Gabriel's association with the Holy Synod is "purely voluntary and for purposes of spiritual guidance, and involves no legal or administrative authority"; that while Kedus Gabriel "usually accept[s] clergymen recommended by the Synod[,]" it "voluntarily follows the spiritual guidance of the exiled Holy Synod, [and its] Church Board is solely responsible for its administrative affairs, including the employment of priests"; and that "[n]either the exiled Holy Synod nor its Patriarch . . . has administrative powers over [Kedus Gabriel]." He explained in his deposition that the Holy Synod's investigating committee gave directives that contravened Kedus Gabriel's bylaws.

There followed appellant's Complaint for declaratory and injunctive relief. The Complaint alleges that appellees have "refused to step aside," in "total defiance of the Holy Synod[.]" The Complaint further asserts that, "unless enjoined, [appellees] will continue to disobey the directions of the Holy Synod."

## II. Applicable Law

The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. The first of these "religion clauses," the Establishment Clause, "prevents the Government from appointing ministers[.]" *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 702-03 (2012). The second, the Free Exercise Clause, "prevents [the government] from interfering with the freedom of religious groups to select their own [ministers]." *Id.*at 703. The religion clauses "severely circumscribe the role that civil courts may play in the resolution of disputes involving religious organizations." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 353 (D.C. 2005). This does not mean, of course, "that churches are above the law or that there can never be a civil court review of a church action." *Heard v. Johnson*, 810 A.2d 871, 879 (D.C. 2002). "There are several areas in which civil courts continue

to have jurisdiction over church actions." *Id.* at 880. Courts may, for example, apply "neutral principles of law" to resolve disputes over church property, *see, e.g.*, *Jones v. Wolf*, 443 U.S. 595, 604 (1979)*,* and "may have jurisdiction over employment disputes where the employee provides a purely secular service for the church." *Heard*, 810 A.2d at 880. However, civil courts "must be careful not to violate the First Amendment by agreeing to resolve a controversy which, at its heart, concerns religious doctrine and practice." *Bible Way*, 680 A.2d at 427 (internal quotation marks omitted); *see also id.* at 429 (noting that a court must not "entangl[e] itself in doctrinal interpretations"); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952) (stating that religious institutions have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"); *Meshel*, 869 A.2d at 353 ("[T]he Establishment Clause precludes civil courts from resolving disputes involving religious organizations whenever such disputes affect religious doctrine or church polity or administration[.]"). "Any attempt by the civil courts to limit [a] church's choice of its religious representatives would constitute an impermissible burden on the church's First Amendment rights." *Pardue v. Center City Consortium Schs. of the Archdiocese of Wash., Inc.*, 875 A.2d 669, 673 (D.C. 2005) (quoting *United Methodist Church, Baltimore Annual Conf. v. White*, 571 A.2d 790, 794 (D.C. 1990)).

### III. Analysis

In arguing that Judge Kravitz erred in concluding that the Superior Court lacks jurisdiction to resolve the parties' dispute, appellant relies heavily on *Watson v. Jones*. 80 U.S. 679 (1871). In *Watson*, the Supreme Court prescribed an approach for resolving a dispute involving a church that is "a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." *Id.* at 722-23. The Court ruled that, in such cases, "the rule of action which should govern the civil courts . . . is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.* at 727; *see also Meshel*, 869 A.2d at 353 ("The Free Exercise Clause requires civil courts to defer to the decisions of the highest tribunals of hierarchical religious organizations on matters of religious doctrine, discipline, faith, and ecclesiastical rule, custom, or law." (citing, *inter alia*, *Watson*,

80 U.S. at 727)).[6]  Appellant contends that the *Watson* rule applies in this case because this "is a classic case of hierarchical authority and church structure." Appellant asserts that Judge Kravitz had authority to find that Kedus Gabriel is part of the hierarchical Ethiopian Orthodox Tewahado Church in the Diaspora, to recognize, upon such finding, that the decisions and orders of the Holy Synod and the Patriarch are binding, and to enforce those decisions and orders, which give appellant control over Kedus Gabriel.

As Judge Kravitz noted, however, "the parties disagree over whether the [Kedus] Gabriel church is hierarchical or congregational in structure."  And as Justice Brennan recognized in his concurrence in *Maryland & Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.* (*Md. & Va. Churches*), "the use of the *Watson* approach is consonant with the prohibitions of the First Amendment only if the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious policy."  396 U.S. 367, 370 (1970) (Brennan, J., concurring); *see also id.* at 369-70 ("[W]here the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts

---

[6]  Civil courts must "give equal deference to decisions on ecclesiastical matters reached by congregational religious organizations[.]"  *Meshel*, 869 A.2d at 354.

are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy."). In *Jones*, a Supreme Court majority acknowledged the same principle, explaining that while determining whether a church is hierarchical or congregational will not be difficult in some cases, "in others, the locus of control would be ambiguous, and [a] careful examination of the constitutions of the general and local church, as well as other relevant documents, [would] be necessary to ascertain the form of governance adopted by the members of the religious association." 443 U.S. at 605 (internal quotation marks omitted). In such cases, the Court held, "the [*Watson*] rule would appear to require a searching and *therefore impermissible* inquiry into church polity." *Id.* (emphasis added, internal quotation marks omitted)).

As appellant has framed the issues, this is just such a case, i.e., one in which "the locus of control [is] ambiguous."[7] *Id.* It is not just that the nature of the relationship between the Kedus Gabriel congregation and the Ethiopian Orthodox Tewahedo Church in the Diaspora under the leadership of Patriarch Merkorios is

_____

[7] We note that in considering the issue of subject matter jurisdiction, Judge Kravitz was permitted to "consider[] matters outside the face of the complaint," including the full summary judgment record, and was not required to "presume that the allegations in the complaint [here, that Kedus Gabriel 'operates exclusively under the control of [the] Ethiopian Orthodox Tewahedo Churches in the Diaspora'] are true." *Second Episcopal Dist. African Methodist Episcopal Church v. Prioleau*, 49 A.3d 812, 815 (D.C. 2012).

hotly disputed, though that is certainly so. See *supra* note 5. Even though the parties are in accord in directing our attention to the Kedus Gabriel bylaws,[8] determining whether the bylaw that acknowledges the Holy Synod's responsibility for "spiritual and religious matters" gives the Holy Synod authority to remove Kedus Gabriel's elected officers in the circumstances that preceded this litigation would impermissibly entangle the court in "doctrinal interpretation[]." *Bible Way*, 680 A.2d at 429. The court would have to determine, for example, whether the judgment of the Holy Synod Committee — i.e., that the administrators and officers elected pursuant to the Kedus Gabriel bylaws must be removed because they "lack spirituality[,]" "broke[] the laws and traditions of the Church," "lost moral standing," failed to accord due respect to the "fathers of the Church," "created unnecessary . . . arguments," and failed to protect "the spiritual well[-]being of parishioners" — constitutes an exercise of responsibility for "spiritual and

---

[8]  Both parties rely on Article 5.7 of Kedus Gabriel's 2012 Third Revised Bylaws, which states that

> The Holy Synod under exile is responsible for any spiritual and religious matters whereas the administrative, financial, property, social and developmental services shall be the responsibilities of the Parish Administrative Council or Board that shall be elected by the general assembly.

religious matters." Answering that question would entail an impermissible inquiry into "church polity," *Jones,* 443 U.S. at 605, would involve the court in deciding "ecclesiastical questions," and would require an impermissible inquiry into "religious doctrine and practice." *Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich*, 426 U.S. 696, 709-10, 714 (1976).[9]  In short, use of the *Watson* approach in this case would not be "consonant with the prohibitions of the First Amendment[.]" *Md. & Va. Churches*, 396 U.S. at 370 (Brennan, J., concurring).

---

[9]    *See also Milivojevich*, 426 U.S. at 720-23 (holding that the Supreme Court of Illinois erred when it exercised jurisdiction over a claim that "the Mother Church's reorganization of the American-Canadian Diocese" was in "excess of its own jurisdiction" and ruled, based on its interpretation of the church constitution, that the American-Canadian Diocese manifested an "intention to retain independence and autonomy in its administrative affairs while at the same time becoming ecclesiastically and judicially an organic part of the Serbian Orthodox Church"; reasoning that "[t]he constitutional provisions of the American-Canadian Diocese were not so express that the civil courts could enforce them without engaging in a searching and therefore impermissible inquiry into church polity," and that the Illinois high court impermissibly "substituted its interpretation of the Diocesan and Mother Church constitutions for that of the highest ecclesiastical tribunals"); *id*. at 714 ("It may be said . . . that . . . the tribunal . . . in its judgment . . . exceeds the powers conferred upon it . . . .  But it is easy to see that if the civil courts are to inquire into [such a] matter[], the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court.  This principle would deprive these bodies of the right of construing their own church laws . . . and would, in effect, transfer to the civil courts . . . the decision of all ecclesiastical questions." (quoting *Watson*, 80 U.S. at 733-34) (internal quotation marks omitted)).

Nor is this a dispute about ownership of property that could perhaps have been  resolved using neutral principles.[10]  To be sure, the second sentence of the Complaint asserts that this matter is about "control over real property[.]" However, as this court has previously explained, "'in determining whether the adjudication of an action would require a civil court to stray impermissibly into ecclesiastical matters, we look not at the label placed on the action but at the actual issues the court has been asked to decide.'"  *Prioleau*, 49 A.3d at 816 (bracket omitted) (quoting *Meshel*, 869 A.2d at 356) [11]; *see also Heard*, 810 A.2d at 885 (looking behind the label "defamation" to the actual issues the court had been asked to decide).  Here, notwithstanding the second sentence of the Complaint, appellant was not actually asking the trial court to resolve a dispute about property. He did not ask the court to decide whether the local church, Kedus Gabriel, or, instead, the Ethiopian Orthodox Tewahedo Church in the Diaspora owns the Evarts

---

[10]  "Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property." *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969).

[11]  This is a principle that we are certain Judge Kravitz well understood because, sitting with this court by designation, he wrote the opinion in *Meshel*, in which he applied "neutral principles of contract law" to determine whether a provision in a religious organization's bylaws was an enforceable arbitration agreement.  869 A.2d at 346.

Street property.[12]  Quite the contrary, the Complaint states in two places that the Evarts Street church property is "owned by Kedus Gabriel" and additionally asks for a transfer to appellant of "all property *belonging to Kedus Gabriel*" (emphasis added).  Thus, this is not a matter that Judge Kravitz might have resolved by, for example, enforcing a provision of the "corporate charter or the constitution of the general church . . . [specifying] . . . that the [local] church property is held in trust for the general church[.]"  *Jones*, 443 U.S. at 607-08.  To the extent that appellant asserted a right to control of church property, he did so not on the basis of neutral principles of law but rather based on arguments that could not be resolved without requiring the court to resolve theological issues that a secular court could not properly resolve.

This also is not a case in which Judge Kravitz could have applied neutral principles of law to resolve a dispute about whether the leaders and members of the Kedus Gabriel Parish Council and Board had been duly elected in accordance with

---

[12]    Had that actually been the task placed before the court, Judge Kravitz might have utilized "*any* one of various approaches for settling church property disputes[,]" *Jones*, 443 U.S. at 602 (quoting *Md. & Va. Churches*, 396 U.S. at 368 (Brennan, J., concurring)), including the application of "neutral principles of law[.]"  *Id.* at 604; *see also Meshel*, 869 A.2d at 357 (recognizing that church property disputes are "susceptible to judicial resolution through the application of neutral principles of law").

church bylaws.[13] In asserting that appellees have no "claim to legitimacy[,]" appellant does not purport to enforce the Kedus Gabriel bylaws; rather, he claims to have suspended the bylaws and asserts that appellees must be required to "step aside" because of the Holy Synod's decree that they have lost "moral standing." "[T]he conformity of the members of the church to the standard of morals required of them" is a matter "strictly and purely ecclesiastical in its character," "over which the civil courts exercise no jurisdiction[.]" *Watson*, 80 U.S. at 733.

Notwithstanding the (bare) allegation in the Complaint that appellee Nega and the members of the Parish Administrative Council have failed to "call[] elections to the council as required by the Kedus Gabriel By-Laws,"[14] the record

---

[13] Had this been the issue, the court would have had subject matter jurisdiction, because "[t]here can be little doubt about the general authority of civil courts to resolve th[e] question" of "which faction of [a] . . . congregation is entitled to possess and enjoy [church] property[,]" *Jones*, 443 U.S. at 602; Judge Kravitz could have looked to the voting procedures described in Kedus Gabriel's bylaws or to the minutes of church meetings, or could have applied a neutral principle, such as the "presumptive rule of majority representation," to resolve the dispute. *Id.* at 607.

[14] This bare allegation was not enough to give the court jurisdiction, because "there is a heightened pleading requirement [for a complaint challenging church action] to assure that the defendants will not be unduly burdened." *Bible Way*, 680 A.2d at 429 (citing *Byrd v. Faber*, 565 N.E.2d 584, 589 (Ohio 1991) (requiring that operative facts in a claim against a church be pled with particularity because of "the myriad [of] First Amendment problems" accompanying such claims), and *Letica Corp. v. Sweetheart Cup Co.*, 790 F. Supp. 702, 706 (E.D.

(continued…)

makes clear that this is really a dispute about whether appellant is entitled to "control over the local church" as its "complete administrator[,]" and whether appellees should be enjoined from holding themselves out as Kedus Gabriel's administrators. Given that the Complaint uses the term "Parish church administrator" to mean "the priest who administers the Church" or "a clergyman who is . . . a priest in charge,"[15] we understand the dispute to be about which individuals are entitled to serve as the clergy of Kedus Gabriel.

As the Supreme Court explained in *Hosanna-Tabor*, and as appellees stressed in their motion for summary judgment,

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the

---

(…continued)
Mich. 1992) (noting courts have required greater specificity in pleading where a case implicates conduct that is, prima facie, protected by First Amendment)).

[15] We note also that appellees' brief identifies appellee Nega as Kedus Gabriel's "Head Priest."

> Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

132 S. Ct. at 706. Informed by both parties' summary judgment papers that the dispute here at bottom is about which clergy have the right to control Kedus Gabriel, Judge Kravitz properly denied relief, on the ground that "the First Amendment does not permit a civil court to determine the religious leader of a religious institution[.]"[16] Accordingly, the judgment of the Superior Court dismissing the Complaint is

*Affirmed.*

---

[16] The Supreme Court in *Hosanna-Tabor* held that a defense rooted in the religion clauses of the First Amendment was an affirmative defense rather than a jurisdictional bar. 132 S. Ct. at 710 n.4. We have no occasion to consider that aspect of *Hosanna-Tabor* in the present case, because the parties have not briefed the issue and because the trial court in any event properly denied relief as a matter of law.