*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 20-CV-0714 & 20-CV-0715

HYUN JIN MOON, *et al.*, APPELLANTS,

V.

THE FAMILY FEDERATION FOR WORLD PEACE
AND UNIFICATION INTERNATIONAL,
*et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-3721-11)

(Hon. Laura A. Cordero & Hon. Jennifer M. Anderson, Trial Judges)

(Argued June 17, 2021     Decided August 25, 2022)

*Michael A. Carvin*, with whom *Jacob M. Roth*, *William G. Laxton, Jr.*, *David T. Raimer*, *Henry W. Asbill*, and *Veena Viswanatha* were on the briefs, for appellant Hyun Jin Moon.

*Derek L. Shaffer*, with whom *William A. Burck*, *John F. Bash*, and *JP Kernisan* were on the briefs, for appellant UCI.

*Francis D. Carter* was on the briefs for appellants JinMan Kwak and Youngjun Kim.

*Christopher B. Mead* was on the briefs for appellant Michael Sommer.

*Laura G. Ferguson*, with whom *James A. Bensfield*, *Alan I. Horowitz*, *Brian A. Hill*, *Michael J. Satin*, and *Dawn E. Murphy-Johnson* were on the brief, for appellees The Family Federation for World Peace and Unification International, The

Universal Peace Federation, and The Holy Spirit Association for the Unification of World Christianity (Japan).

G. *Edward Powell III*, *Steffen N. Johnson*, and *Paul N. Harold* filed an *amicus curiae* brief for Professors Elizabeth A. Clarke, Robert F. Cochran, Jr., Teresa Collett, Carl H. Esbeck, Richard W. Garnett, John D. Inazu, Douglas Laycock, Michael P. Moreland, Robert J. Pushaw, and David A. Skeel in support of appellants.

*Eric C. Rassbach* and *William J. Haun* filed an *amicus curiae* brief for The Jewish Coalition for Religious Liberty and The Becket Fund for Religious Liberty in support of appellants.

Before GLICKMAN and DEAHL, *Associate Judges*, and BECKER,∗ *Associate Judge, Superior Court of the District of Columbia*.

DEAHL, *Associate Judge*:  The Reverend Sun Myung Moon founded a religion known as the Unification Church in 1954.  He was the religion's spiritual leader for nearly sixty years.  In the final years of Rev. Moon's life, and through the present day, a religious schism has fractured the Church and its adherents.  On one side of the rift is Rev. Moon's eldest living son, Dr. Hyun Jin (or Preston) Moon, whom Rev. Moon had once declared his spiritual successor and the "fourth Adam," following the Biblical Adam, Jesus Christ, and Rev. Moon himself.  Preston views the Church as an interfaith movement and wants it to grow as a non-denominational and decentralized religion, a course Rev. Moon had once charted for it as well.  Preston is also Chairman of the board of directors of a non-profit corporation known as Unification Church International ("UCI"), which holds considerable assets—once

---

∗ Sitting by designation pursuant to D.C. Code § 11-707(a).

in the ballpark of $1 billion or more—earmarked for advancing the Unification Church and its principles. On the other side of the divide is Rev. Moon's widow, Hak Ja Han Moon, and his younger son, Hyung Jin (or Sean) Moon. Both of them have claimed to be Rev. Moon's successor as spiritual leader of the Church and, at different times, each has led the Family Federation for World Peace and Unification International. They believe the Family Federation is the institutional embodiment of the Unification Church, effectively synonymous with it, and that UCI is bound to support it.

The Family Federation, among others, sued Preston and the rest of UCI's board of directors, claiming that UCI's directors breached their fiduciary duty of loyalty to the Unification Church in two distinct ways. First, UCI's directors caused about half of UCI's assets to be donated against the wishes of, and to entities unaffiliated with, the Family Federation, which claims to be the "authoritative religious entity that directs Unification Churches worldwide." Second, to facilitate those donations, the directors amended UCI's articles of incorporation. They removed purposes such as "assisting, coordinating, and guiding the activities of Unification Churches," and "further[ing] the theology of the Unification *Church*," and left in their place commitments like "support[ing] the understanding and

teaching of the theology and principles of the Unification *Movement*" (emphases added).

The central issue in this appeal is whether this dispute is one for civil courts to resolve. The First Amendment generally precludes civil courts from resolving religious conflicts, in what is sometimes called the religious abstention doctrine. Whether that doctrine bars the District's courts from resolving the present dispute, or whether it instead can be resolved through the application of neutral principles of law without wading into religious questions, has proven a vexing question. The Superior Court initially dismissed the underlying suit on religious abstention grounds, concluding that it could not be resolved without "venturing into religious questions forbidden by the First Amendment." *Family Fed'n for World Peace & Unification Int'l v. Hyun Jin Moon (Moon I)*, 129 A.3d 234, 239 (D.C. 2015). We reversed, reasoning that dismissal was "premature" at the motion-to-dismiss stage because it was possible that evidence might be adduced that would permit the dispute to be resolved through neutral principles of law. *Id.* at 248-52. On remand, and after extensive discovery, a newly assigned judge concluded that the conflict could indeed be resolved by applying neutral legal principles. In the orders now on appeal, the court granted summary judgment in the Family Federation's favor and directed that the UCI directors be removed from their posts and held personally liable to UCI for

more than half-a-billion dollars.  In doing so, the court described this case as less a quarrel over church doctrine and more "a struggle for power and money."

It is certainly that, but this struggle for power and money cannot be resolved without answering core questions about religious doctrine.  And we are precluded from providing those answers.  It is not for the courts to pronounce, as the trial court did, that the Family Federation is the "authoritative religious entity" that ordains what does and does not benefit the Unification Church.  Nor can we say that UCI's directors fundamentally altered its articles of incorporation without first addressing religious questions that we cannot entertain.  UCI's articles could have vested final decision-making authority in a particular institutional actor like the Family Federation, but they have never done that.  *See Jones v. Wolf*, 443 U.S. 595, 603 (1979) ("[R]eligious societies can specify . . . what religious body will determine the ownership in the event of a schism or doctrinal controversy.").  Absent that, it is not for us to pass judgment on whose vision of the Unification Church, or Unification Movement, is more faithful to the purposes UCI was established to advance.  That religious question is outside of this court's purview.

We therefore reverse and vacate the trial court's grant of summary judgment and its subsequent remedies order.

**I.**

The following facts are taken from the summary judgment record.  Except where otherwise noted, they are not disputed.

*The Beginnings of the Unification Church and UCI*

The Reverend Sun Myung Moon founded the Holy Spirit Association for the Unification of World Christianity ("HSA"), a religious institution based in Seoul, South Korea, in 1954.  HSA organized congregations, developed religious doctrines and rituals, published texts, accepted members, and collected tithes and offerings. Both HSA and the religion it espoused came to be known colloquially as the "Unification Church," though there is no legal entity by that name.  Adherents of the religion regard Rev. Moon as a non-divine "messianic" figure.  They sometimes refer to Rev. Moon as the "third Adam," following the Biblical Adam and Jesus Christ.  Rev. Moon served as the Unification Church's "spiritual leader" for nearly sixty years—from its founding until the final years of his life.  He and his now-widow, Hak Ja Han Moon, are sometimes referred to by their followers as the "True Parents of Humankind."

The Unification Church grew into a global movement encompassing religious, cultural, educational, media, and commercial enterprises. In addition to HSA, Rev. Moon and his supporters established religious institutions around the globe, including appellee Holy Spirit Association for the Unification of World Christianity (Japan) ("HSA Japan").[1] They also founded a large number of nonprofit organizations, such as appellee Universal Peace Federation ("UPF"),[2] and for-profit corporations such as *The Washington Times* newspaper, the Tongil Group business conglomerate, and the seafood distribution company True World Group. Because Rev. Moon maintained "spiritual and charismatic authority" over the religion, he held "moral authority" over those organizations. Yet, he did not have *legal* authority over them.

---

[1] An expert on behalf of the Family Federation, Michael Mickler, estimated that the Unification Church established a presence in 185 nations by the turn of the twentieth century.

[2] Formerly known as the "Interreligious and International Federation for World Peace," UPF's Charter described itself as "a global alliance of individuals and organizations guided by universal values and principles and dedicated to building, through service to others, a world of peace, a world in which everyone can live together in freedom, harmony, cooperation and co-prosperity, as one global family." Like many other organizations under the Unification Church umbrella, UPF is legally independent from the Unification Church; indeed, the words "Unification Church" appear nowhere in its founding documents.

In the 1970s, Rev. Moon directed a close associate to establish a nonprofit corporation called Unification Church International, or UCI, in the District of Columbia.  UCI is not itself a church.  But its articles of incorporation, as they appeared in 1980 until Preston and the UCI directors amended them in 2010, set forth its core purposes as supporting the Unification Church and its principles.[3]  The 1980 articles recognized that Rev. Moon "has provided the inspiration and spiritual leadership for the founding of [UCI] and is the spiritual leader of the international Unification Church movement."  In addition, the 1980 articles specified UCI's five "organizational and operational purposes":

1. To serve as an international organization assisting, advising, coordinating, and guiding the activities of Unification Churches organized and operated throughout the world.

2. To promote the worship of God, and to study, understand and teach the Divine Principle,[4] . . . and, through the practical application of the Divine Principle, to achieve the interdenominational, interreligious, and international unification of world Christianity and all other religions.

---

[3] The first version of UCI's articles of incorporation appeared in 1977, when UCI was first incorporated.  The articles were amended in 1980 in order to eliminate reference to an earlier plan for UCI to apply for tax-exempt status.  Those revisions are not material to this case.

[4] The Divine Principle is one of Rev. Moon's early theological texts.  It elucidates many of the Unification Church's core beliefs.

3. To establish, support and maintain . . . [such] places for the worship of God and for the study, understanding and teaching of the Divine Principle . . . to further the theology of the Unification Church.

4. To publish and disseminate throughout the world . . . publications in order to carry forward the dissemination and understanding of the Divine Principle [or] the unification of world Christianity and all other religions . . . .

5. To sponsor and conduct cultural, educational, religious, and evangelical programs for the purpose of furthering the understanding of the Divine Principle, the unification of world Christianity and other religions, world peace, harmony of all mankind, interfaith understanding between all races, colors and creeds throughout the world, and for such other purposes consistent with the Divine Principle and the purposes of the Corporation.

UCI served primarily as a "funding source" for organizations and projects Rev. Moon founded or supported. Over the decades, UCI donated funds to a sweeping array of recipients, such as UPF, the Universal Ballet, the University of Bridgeport, *The Washington Times*, a firearms manufacturer, a recording studio and performing arts center, a martial arts association, and the aforementioned seafood distribution network. UCI also transferred limited funds to Unification Church institutions like HSA, but far more money flowed in the opposite direction, with the

churches subsidizing UCI, rather than UCI subsidizing them.[5]   HSA Japan in particular transferred around $100 million annually to UCI for many years.

*A Shift in the Unification Church and Preston's Rise Within It*

In the mid-1990s, Rev. Moon established the Family Federation for World Peace and Unification International, intending for it to replace HSA.  Through the Family Federation, Rev. Moon sought to commence "the providential age in which families may receive salvation that transcends the boundaries of religion, nationality and race."  In a speech he delivered around that time, Rev. Moon announced that "[t]he time is coming that we will not need a church.  The time for the Unification Church is passing and a new time for the Family Federation . . . is coming."  In another speech, which he delivered in 1997, Rev. Moon declared:

> Now is the time for all these old church or church-related signs to come down; a new form should emerge.  The church era focuses on individual salvation; however, it is time to rise from the individual level of salvation to the family level, because the family is the cornerstone or basic unit for building a nation.

---

[5] In the twelve years before the UCI board elected Preston as its Chairman in 2006, for instance, it is undisputed that less than five percent of UCI's total disbursements were made to church institutions (such as Holy Spirit Associations, Unification Churches, and the Family Federation).

During that ceremony, Rev. Moon took down a banner depicting the Unification Church's symbol and buried it.  Some of Rev. Moon's followers have since interpreted these events as marking the "end of the church era."[6]

In 1998, Rev. Moon publicly announced that Preston had been named vice president of the Family Federation.  The "significance of this inauguration," Rev. Moon explained, was that it marked "the era of the fourth Adam" (recall that Rev. Moon was the "third Adam").  Rev. Moon continued that it was his hope and prayer that Preston would "become much greater than me, 1,000 times greater, and fulfill the mission which is yet to be done."  Preston testified that he understood his "inauguration" to mean that Rev. Moon had recognized him as a "messianic figure" and selected him as the Reverend's spiritual heir.

Almost immediately, Rev. Moon began expanding Preston's leadership role within the movement.  Over the next decade, Preston was appointed to high-ranking positions within multiple Church-related organizations.  For instance, he began serving as co-chairman of UPF's governing board.  Through UPF, with his father's blessing, Preston spearheaded the organization of a number of "global peace

---

[6] Notwithstanding these events, adherents and outsiders would still often refer to the Family Federation as the "Unification Church," as they had with HSA.

festivals"—multi-day events designed to promote world peace, involving speakers, entertainment, and service projects. Under Preston's leadership, UPF was "non-sectarian." In his words, that approach was "based upon [his] father's vision," "rooted in the providential vision of one family under God"[7] that did not "promote any one religion." Preston was also elected by UCI's board of directors to serve as UCI's president and chairman in 2006. Rev. Moon offered his "wholehearted support" for his son's election.

*Preston Breaks from the Family Federation and Solidifies Control of UCI*

In 2008, about a decade after Rev. Moon dubbed him the "fourth Adam," Preston's rise within most of the Church's institutional entities came to a halt. In a twenty-five-page letter captioned "Report to Parents," Preston updated Rev. Moon and Hak Ja Han on the Unification Church's state and direction, as he saw them. Sensing a division in the Church, Preston believed the Church was "at a crossroads." He wished "to make [] very clear" where the Church "should be headed and how all the different organizations should align." Preston proposed to break down "the walls of religion" in order to "take on the challenge of a true inter-faith movement that

---

[7] According to Preston, "One Family Under God" was his father's non-sectarian "vision of humanity," a vision Preston has since championed.

could unite the body of faith through the world . . . rather than trying to protect and grow the institution of the Unification Church." Preston wanted two of the organizations he led, UCI and UPF, to coordinate that vision.

One month after Rev. Moon and Hak Ja Han received the "Report to Parents," the Family Federation announced that Preston's younger brother, Sean Moon, had been named its new president. Sean did not share Preston's views about the direction of the Unification Church; he supported a "denominational" rather than an "interfaith" vision. In a memorandum purporting to "clarify the structure of all the worldwide organizations according to True Parents' special instruction,"[8] Sean announced to Church leadership that he would be overseeing "[a]ll organizations" moving forward, acting under the direction of his parents. At a "coronation" ceremony around this time, Rev. Moon and Hak Ja Han placed a crown on Sean's head. Preston has not had any involvement with the Family Federation since.

Preston remained Chairman of UCI's board of directors, however. And in 2009, he took steps to replace the four other directors with associates who shared his

---

[8] Preston and the other UCI directors dispute that Sean had authority to issue these instructions and also that the memorandum truly reflected his parents' (the "True Parents") instructions.

view of the Unification Church as a decentralized and interfaith movement. Preston first called a special meeting of the board in January 2009, at which the four directors in attendance (with one absent) unanimously elected two of Preston's close associates as directors: Richard Perea and appellant Michael Sommer. Immediately thereafter, then-directors Thomas Walsh and Victor Walters resigned from their seats on the board. Walsh testified that he did so at the request of Preston's brother-in-law and confidante, Jin Hyo Kwak, and only because Walsh mistakenly assumed Rev. Moon had approved the request. Walters similarly testified that Kwak told him that resigning would be in his best interests. Kwak disputes asking for Walsh or Walters to resign.

Several months later, the two directors who had not resigned—Peter Kim and Douglas Joo—requested another special meeting to nominate new board members of their own. Neither received a vote. Preston, Sommer, and Perea did not attend the meeting, depriving the board of a quorum. The following month, Preston, Sommer, and Perea voted to remove Kim and Joo from UCI's board. They replaced them with two of Preston's brothers-in-law, appellants JinMan Kwak and Youngjun Kim.

In summary, within the year, every director but Preston had been replaced. The new directors each followed one "school of thought," sharing Preston's view of the Unification Church as a decentralized and interfaith movement. They were generally hostile to those (like Sean) who viewed the Church as denominational and saw the Family Federation as its institutional embodiment or central authority. But the new UCI directors were far from outsiders to the Unification Church. Each of the new board members had grown up in the Unification Church and had spent many decades within it; they had each served as Church missionaries and/or run movement-related businesses or non-profits. Kwak and Youngjun Kim were also born into families of Rev. Moon's earliest disciples—sometimes referred to as the "thirty-six couples"—and Rev. Moon personally named both of them.

Midway through the board's overhaul in 2009, Rev. Moon summoned Preston to a meeting in Korea and asked him to "step down from UCI and spend one year with him." Preston refused. He testified that, at eighty-nine years of age, his father's "condition was much diminished" and that he was "vulnerable" to manipulation by those who did not share his true vision for the Church.[9] Preston feared that if he

---

[9] Preston and the directors adduced video evidence from around this time that they contend shows "Hak Ja Han and Sean cajoling a semi-conscious Rev. Moon to sign a document naming Sean as 'representative and heir'" of a contrivance called the "command center of cosmic peace and unity." They aver that the video

stepped down for a year, those loyal to the Family Federation—but heretical to what he believed the Church to be—"would hijack everything in our movement." "[T]hey had the Tongil Foundation; they controlled [HSA] Japan; they controlled the Family Federation; and they controlled UPF." Preston's position in UCI was his last stronghold of institutional power within the religion and he would not relinquish it. Rev. Moon met with Preston again later that year, after the board's overhaul was complete, and asked Preston to resign from all his positions with Unification Church affiliates. Preston again refused to leave UCI. He told a group of supporters that Rev. Moon "turned" on him and is now "on that side."

*Preston Establishes the Global Peace Foundation to Displace UPF*

Later in 2009, Sean was appointed chair of UPF, replacing his brother Preston. That same day, Preston published an open letter on UPF letterhead announcing that the global peace festivals already on the calendar would go forward not as projects of UPF, but through "a separate [] foundation" that was "being established for this purpose." This new foundation, Preston indicated, would have no "formal or legal

---

demonstrates that Rev. Moon, at this stage in his life, "was no longer in control of his faculties and was being manipulated by others." We do not, and need not, assess the extent to which that description of the video is accurate.

association with" the Family Federation. Preston wrote that Rev. Moon's "vision" had "[a]lways" been UPF's "guiding ideal," and that, through the new foundation, Preston would "remain committed" to achieving that vision of "a God-centered world in which people of every race, religion, nationality and culture live in harmony as members of one family under God."

Soon thereafter, Preston registered the Global Peace Foundation ("GPF") to take over the organization of global peace festivals. The Family Federation issued an announcement opposing the move: "True Parents strongly disapprove of the corporate registration of GPF . . . and have stated that our church and providential organizations, and their members, should not take part in or be involved in its activities." Notwithstanding that directive, UCI (under Preston's control) ceased making contributions to UPF and began funding peace festivals through GPF. Over the next six-plus years—until the Superior Court issued an injunction prohibiting the disbursement of additional funds in 2016, discussed below—UCI donated more than $34 million to GPF, a majority of GPF's total funding.

*The UCI Board Amends Its Articles of Incorporation*

In April 2010, with Preston at its helm, UCI's board of directors voted to amend the organization's articles of incorporation. Among other changes, the

amendments omitted two references to the "Unification Church,"[10] replacing them with a single reference to "the Unification *Movement*" (emphasis added). They also omitted six references to the "Divine Principle," an indisputably central text of the religion, and replaced them with a single reference to the "theology and principles of the Unification Movement." The 1980 articles' first-enumerated purpose, "[t]o serve as an international organization assisting, advising, and guiding the activities of Unification Churches organized and operated throughout the world," was omitted. Finally, the amendments officially changed the corporation's name from "Unification Church International" to "UCI." The following table shows the full extent of the 2010 amendments:

| Amendment to 1980 Articles | 2010 Articles |
|---|---|
| (1) To serve as an international organization assisting, advising, coordinating, and guiding the activities of Unification Churches organized and operated throughout the world. | |
| (2) To promote the worship of God, and to study, understand and teach the Divine Principle, the new revelation of God, and, through the practical application of the Divine Principle, to achieve the interdenominational, interreligious, and | (b) To promote interdenominational, interreligious, and international unification of world |

---

[10] Relatedly, months before these amendments, Sean at least purported to change the name of the Family Federation to "the Unification Church." The name change was reversed several years later when Hak Ja Han wrested control of the Family Federation from Sean, post-Rev. Moon's death, as discussed below.

| | |
|---|---|
| international unification of world Christianity and all other religions. | Christianity and all other religions. |
| (3) To ~~establish,~~ [promote and] support ~~and maintain, anywhere in the world, such place or places for the worship of God and for the study,~~ [the] understanding and teaching of ~~the Divine Principle as may be necessary or desirable, to further the~~ theology [and principles] of the Unification ~~Church~~ [Movement]. | (c) To promote and support the understanding and teaching of the theology and principles of the Unification Movement. |
| (4) To publish and disseminate throughout the world, newspapers, books, tracts[,] ~~and~~ other publications [and forms of media] in order to ~~carry forward the dissemination and understanding of the Divine Principle, the unification or world Christianity and all other religions, or otherwise to~~ further the purposes of the Corporation. | (d) To publish and disseminate throughout the world, newspapers, books, tracts, other publications and forms of media in order to further the purposes of the Corporation. |
| (5) To ~~sponsor~~ [promote] and conduct, ~~cultural,~~ educational, [cultural, and] religious, ~~and evangelical~~ programs for the purpose of furthering ~~the understanding of the Divine Principle, the unification of world Christianity and other religions,~~ world peace, harmony of all [hu]mankind, interfaith understanding ~~between~~ [among] all races, colors and creeds throughout the world~~, and for such other purposes consistent with the Divine Principle and the purposes of the Corporation~~ [throughout the world]. | (a) To promote and conduct educational, cultural, and religious programs for the purpose of furthering world peace, harmony of all humankind, interfaith understanding among all races, colors and creeds throughout the world. |

According to Preston, these amendments served two purposes: to "modernize" and "professional[ize]" UCI, and to "make [the articles] more

accurate" because "the providential shift that [his] father announced" in the 1990s "wasn't captured . . . in the [1980] articles." The directors maintain that these amendments did not effect a "fundamental change" to UCI's corporate purposes because they "incorporated all the purposes" of the 1980 articles, and simply reflected organic "changes in the movement" since 1980. The Family Federation counters that the amendments were meant not to "modernize" UCI at all, but to fundamentally alter its relationship with the Unification Church. They point to an email sent by a lawyer who helped draft the amendments, which suggested that the goal of the amendments was to "stay within a broad 'world peace and harmony' framework" while "eliminating the Unification Church, Divine Principle, and most religious references" from the document. According to the Family Federation, the real reason the directors sought to dissociate UCI from the institutional Unification Church was "to pave the way" for a corrupt transfer of around half UCI's assets to an unaffiliated (and unaccountable) foundation.

*UCI's Massive Donation to the Kingdom Investments Foundation*

Shortly after those amendments, UCI's agents set up a Swiss foundation called the Kingdom Investments Foundation (KIF) for the purpose of receiving

certain UCI assets.[11]  Then-UCI director Perea served as one of KIF's founding board members; the other two were "individuals in whom the UCI board could place confidence."  Next, UCI entered into a donation agreement with KIF, under which UCI agreed to "irrevocably transfer" certain assets to KIF to advance the agreement's prescribed purposes.

The purposes outlined in the donation agreement mirrored the purposes set forth in UCI's amended articles.  In other words, the donation agreement stated that KIF was to use the donated assets to support UCI's own purposes as reflected in its amended articles, for example, to "promote and support the understanding and teaching of the theology and principles of the Unification Movement."  KIF's own corporate purposes were also similar to UCI's, although they differed in two ways. First, they omitted any mention of promoting "international unification of world

---

[11] Although KIF was not created until after the articles were amended, appellees stress that the transfer of UCI assets to an entity like KIF was contemplated several months in advance.  Specifically, they point to an email drafted in February 2010, by a lawyer who was working for the directors.  That email contemplated "the donation of certain UCI owned real estate assets to a newly created Swiss foundation," and recommended that "[t]he purposes for which the Swiss foundation is organized should be consistent with, if not identical to, the purposes for which UCI is organized."  Because Swiss law required that KIF not be organized to support a particular religious organization, that congruity could only be achieved by eliminating all references to the Unification Church in UCI's articles—including the name of the corporation itself.

Christianity and all other religions." And second, they replaced the promotion of "theology and principles of the Unification Movement" with the promotion of "ethical principles." Preston explained that those differences stemmed from an understanding that "Swiss law made it very clear that [KIF] could not be a religious entity."

UCI then transferred to KIF its majority interests in two Seoul-based real estate developments: "Parc1" and "Central City Limited." It also transferred to KIF an interest in a Korean ski resort, a 65% interest in a Korean construction company, and roughly $2 million in cash holdings. Together these assets' book value exceeded $469 million, approximately half of UCI's total value.[12] UCI's directors testified that they effected the transfer to reap tax benefits in connection with Parc1 and Central City and to secure financing for Parc1's completion. They also testified that, due to the Unification Church's poor reputation, Korean banks might be reluctant to finance the Parc1 project if those banks perceived that it was affiliated with the Unification Church. The directors claim to have understood that a barrier to financing might jeopardize the project's completion. According to Preston and

---

[12] Perea resigned from UCI's board of directors and was appointed as one of KIF's founding board members shortly before UCI approved these transfers.

director Kwak, developing the Parc1 plot on Seoul's Yeouido Island was Rev. Moon's "lifelong dream." Yet, they did not inform Rev. Moon—or the Family Federation, Hak Ja Han, or Sean—of UCI's transfer to KIF before making it.[13]

*The Underlying Lawsuit, Post-Suit Developments, and Prior Appeals*

Appellees Family Federation, HSA Japan, and UPF sued UCI's directors alleging that they breached their fiduciary duties to UCI. These claims have been litigated in the District's courts for over a decade. *See generally Family Fed'n for World Peace & Unification Int'l v. Hyun Jin Moon (Moon I)*, 129 A.3d 234 (D.C. 2015); *Fam. Fed'n for World Peace v. Hyun Jin Moon (Moon II)*, Nos. 16-CV-881 & 17-CV-23, Mem. Op. & J. (D.C. July 22, 2018). A number of developments have occurred in the meantime.

---

[13] The Family Federation contends the directors' explanations for the transfer are implausible. It contends that there "were no near-term tax benefits to UCI" from the transfer, that any long-term benefits were "illusory when balanced against the value of what they gave away," and that "[p]revious delays associated with the [Parc1] project" had already been resolved prior to the transfer. The Family Federation further suggests that KIF's prompt sale of the Central City asset for "close to $1 billion," and the fact that the directors have never accounted for how the proceeds of that sale were used, are further indications that they did not act with any intention to advance the religion or its principles, but instead acted in bad faith.

Rev. Moon passed away in September 2012 at the age of ninety-two. His widow, Hak Ja Han, then laid claim to her husband's role as spiritual leader of the Unification Church and stripped Sean of his leadership roles. Sean sued his mother in federal court and sought a declaration that he was the "worldwide Leader of the Unification Church and Family Federation." The court dismissed Sean's claim on First Amendment grounds, and the Second Circuit affirmed. *See Moon v. Moon*, 431 F. Supp. 3d 394, 400 (S.D.N.Y. 2019), *aff'd*, 833 F. App'x 876 (2d Cir. 2020). To this day, Sean maintains that he is Rev. Moon's rightful successor, and he has created the "Sanctuary Church" to carry out that role.

Returning to this case, the trial court initially dismissed the suit against Preston and the UCI directors on the grounds that it "could not be decided without the court's venturing into religious questions forbidden by the First Amendment." *Moon I*, 129 A.3d at 239. The plaintiffs appealed that decision and we reversed, concluding that dismissal was premature because, "on its face," there was nothing about the case that suggested it would not be "susceptible to resolution by 'neutral principles of law'" in a manner that would avoid "any forbidden inquiry into matters barred by the First Amendment." *Id.* at 249. Although we found the dismissal of plaintiffs' claims premature, we acknowledged that the case might later need to be dismissed on First Amendment grounds, but that any such dismissal "should be

based on a fuller exposition of the facts underlying each cause of action and not be decided on the pleadings prior to discovery and further evidentiary presentation by plaintiffs." *Id.*

On remand, the trial court entered "a preliminary injunction restricting UCI's disbursement of funds pending trial," as the Family Federation had requested. *Moon II*, Mem. Op. & J. at 2. The directors appealed on First Amendment grounds, contesting two statements of fact that "formed the basis for the court's determination"—that the Family Federation was "the authoritative religious entity that directs Unification Churches worldwide," and that "the Divine Principle is the 'theological textbook' of the Unification Church." *Id.* at 8. We affirmed, but only after stressing that the "lion's share of the documents with which the [directors] seek to substantiate the alleged factual disputes [were] outside the relevant [preliminary injunction] record." *Id.* Our analysis in fact began with 3.5 single-spaced pages describing (1) just how limited the preliminary injunction record on review was, and (2) how the directors had failed to raise in the trial court the various factual disputes they were pressing on appeal. *Id.* at 2-5. This exhaustive caveat preceded our ultimate ruling that "*at the time the preliminary injunction was litigated*, there were 'no theological questions for the court to resolve.'" *Id.* at 9 (emphasis added). We further caveated that the issue should be revisited "if it becomes apparent to the trial

court that this dispute does in fact turn on matters of doctrinal interpretation or church governance." *Id.* at 9 n.4.

The litigation returned to the trial court, which ultimately granted summary judgment in favor of appellees on their breach of fiduciary duty claims. The court reasoned that there was no genuine dispute that the directors violated their fiduciary obligations to UCI by (a) "substantially alter[ing] UCI's corporate purposes" (as reflected in the 1980 articles) and (b) donating around half of UCI's assets to KIF and GPF, two entities that were "unaffiliated with the Unification Church." Following a month-long remedies hearing, the court ordered Preston, Sommer, Kwak, and Youngjun Kim's removal from UCI's board and held them jointly and severally liable to UCI for a $530 million "surcharge."[14] The directors, together with UCI, now appeal the summary judgment and remedies orders. They contend that

---

[14] Because Perea had stepped down from UCI's board before the KIF transfer took place, *supra* note 12, the trial court granted summary judgment in his favor as to the alleged breach of fiduciary duty related to that transfer. The court also did not impose the surcharge against Perea for that same reason, and for the additional reason that the record did not indicate whether he had personally approved any of the GPF transfers.

the trial court's grant of summary judgment contravened the religious abstention doctrine rooted in the First Amendment.[15]

**II.**

The First Amendment's Religion Clauses "severely circumscribe the role that civil courts may play in the resolution of disputes involving religious organizations." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 353 (D.C. 2005) (citing *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). Courts "must be careful" to avoid adjudicating "church fights that require extensive inquiry into matters of ecclesiastical cognizance." *Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419, 427 (D.C. 1996) (internal quotation omitted).

---

[15] While it is not the subject of this appeal, Appellee HSA Japan also sued UCI, raising contract and quasi-contract claims. *See Fam. Fed'n for World Peace v. Hyun Jin Moon (Moon I)*, 129 A.3d 234, 246-47 (D.C. 2015). Those claims remain live in the trial court. The court's remedies order is thus not a final order or judgment, given the still-pending claims, but we nonetheless have jurisdiction to entertain this appeal under D.C. Code § 11-721(a)(2)(A) (conferring jurisdiction over interlocutory orders granting injunctive relief); *see also District of Columbia v. E. Trans-Waste of Md., Inc.*, 758 A.2d 1, 8 (D.C. 2000) (jurisdiction to review the propriety of injunctive relief extends to review of orders the relief is based on).

For example, civil courts are barred from deciding disputes that turn on "the interpretation of particular church doctrines" or "the importance of those doctrines to the religion." *Presbyterian Church*, 393 U.S. at 450. Likewise, a civil court may not ordain matters of "church polity or administration," *Meshel*, 869 A.2d at 353, by, for instance, "determin[ing] the religious leader of a religious institution." *Samuel v. Lakew*, 116 A.3d 1252, 1261 (D.C. 2015); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012) (religious bodies must have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine") (citation omitted). Court involvement in such disputes would "impermissibly entangle" the judiciary in "ecclesiastical matters," *Meshel*, 869 A.2d at 353, jeopardizing the values underlying the Religion Clauses and "inhibiting the free development of religious doctrine." *Presbyterian Church*, 393 U.S. at 449.[16]

---

[16] Appellees make much of the fact that UCI is not a church, emphasizing that they sued the directors purely in their "secular capacity." They suggest this court already attached significance to that in *Moon I*. *See* 129 A.3d at 249 ("This is not a suit directly against a church, synagogue, or mosque or their immediate leadership. On the contrary, the defendant entity at issue here is a taxable, albeit nonprofit, corporation."). However, the religious abstention doctrine concerns the "subject-matter of [the] dispute," not the identity of the parties. *Watson v. Jones*, 80 U.S. 679, 733 (1871). At its core, it precludes courts from wading into "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id.* Just as civil courts may not settle a religious succession dispute when it arises between two would-be successors, neither may they ordain the rightful successor where third

That is not to say that the First Amendment precludes civil courts from resolving any dispute with religious implications. *See Bible Way Church*, 680 A.2d at 427; *United Methodist Church v. White*, 571 A.2d 790, 795 (D.C. 1990) ("[T]he church is not above the law."). A civil court may, for instance, resolve a property dispute between factions of a church, so long as it can do so through "neutral principles of law" without deciding contested matters of church doctrine, polity, or practice. *Moon I*, 129 A.3d at 250, 252. Similarly, a court may enforce a contract— even when one or more of the parties to it is a religious organization—when the terms of the contract require no incursion into the ecclesiastical domain. *See, e.g.*, *Meshel*, 869 A.2d at 346 (invoking "neutral principles of contract law" to enforce an arbitration clause, even though the underlying dispute involved a religious controversy); *Second Episcopal Dist. African Methodist Episcopal Church v. Prioleau*, 49 A.3d 812, 817-18 (D.C. 2012) (holding that a civil court can resolve a dispute over an employment contract between a church and a pastor when the

---

parties attach some significance to the question (via contract, for instance). We said nothing to the contrary in *Moon I*, as we merely observed that the allegations in the complaint—again, that case came to us at the motion-to-dismiss stage—painted UCI as "basically operating in a secular capacity," which could suggest an absence of religious questions in the case. But the evidence that has since been developed makes clear that the question of whether UCI has breached a fiduciary duty of loyalty to the Unification Church is entangled with religious questions about what the Church is, what its core principles are, and who might rightly be called its spiritual (or institutional) leader.

breached provision did not "require the court to entangle itself in church doctrine," and the pastor was not seeking reinstatement). In determining whether a controversy is justiciable, we must look past "the label placed on the action" and consider "the actual issues the court has been asked to decide." *Moon I*, 129 A.3d at 249 (quoting *Samuel*, 116 A.3d at 1259). *Compare Meshel*, 869 A.2d at 358 (suit to compel arbitration appears religious on its face, but sounds in "well-established, neutral principles of contract law"), *with Heard v. Johnson*, 810 A.2d 871, 885 (D.C. 2002) (defamation claim appears secular, but implicates religious practice).

Here, the trial court rejected the directors' argument that the First Amendment barred its adjudication of plaintiffs' breach of fiduciary duty claims. The court then granted plaintiffs' motion for summary judgment as to those claims, finding the directors breached their fiduciary duties as a matter of law both (1) when they "substantially altered UCI's corporate purposes" by amending the 1980 articles, and (2) when they voted to transfer a large portion of UCI's assets to "entities that are unaffiliated with the Unification Church." The directors contend that the trial court's ruling on plaintiffs' fiduciary-duty claims violated the First Amendment. Based on the record before us, which is far more developed than what was before us in either

*Moon I* or *Moon II*, we agree.[17]  We address the two theories of fiduciary breach in turn, concluding that the grant of summary judgment on either ground would improperly intrude on religious questions.

## A.

We turn first to the trial court's judgment that the directors breached their fiduciary duties to UCI by substantially altering UCI's articles of incorporation.[18]  It is "a 'basic principle' of corporate law 'that directors are subject to the fundamental fiduciary duties of loyalty and disinterestedness.'"  *Moon I*, 129 A.3d at 251 (quoting

---

[17] While we were obliged to treat the allegations as true at the motion to dismiss stage in *Moon I*, the evidence that has now been adduced through discovery has raised a host of material factual disputes inhibiting our ability to resolve this case on neutral principles of law.  Among them, as we detail below, are disputes about whether the Unification Church refers to an institutional actor, or instead a set of theological beliefs; whether the Family Federation is truly the authoritative religious entity directing the Unification Church, particularly if it is indeed a set of theological beliefs; whether the Unification Movement is just another term for Unification Church, and one that is perhaps more faithful to Rev. Moon's vision than what the Family Federation now proselytizes; the centrality of the Divine Principle in that religion; and whether GPF and KIF furthered the goals of the religion, whether it be called the Unification Church or the Unification Movement.

[18] The trial court assumed that UCI's "objects and purposes" could be found in its articles and, therefore, that a substantial change to the articles was also a substantial change to UCI's corporate purposes.  Because neither party contests that assumption, we proceed under the same premise.

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988)). As we said in *Moon I*, "[i]t can be a breach of duty to 'change substantially the objects and purposes of the corporation.'"[19] *Id.* at 252 (quoting 7A Fletcher Cyclopedia of the Law of Corps. § 3718 (2006)).

That said, directors retain the prerogative to update and adapt a corporation's objects and purposes to suit changing circumstances; those at the helm of a corporation are given a wide berth to steer it. Amendments to corporate articles will not provide viable grounds for suit where they "are designed to enable the corporation to conduct its authorized business with greater facility, more beneficially, or more wisely," 7A Fletcher, *supra*, at § 3684 (2021) (quoting *Sherman v. Pepin Pickling Co.*, 41 N.W.2d 571, 577 (Minn. 1950)), or do not "change the essential character of the business," *id.* (quoting *Wright v. Minn. Mut. Life Ins. Co.*, 193 U.S. 657, 664 (1904)). When evaluating whether a change to corporate articles constitutes a breach of duty, we do not ask merely whether some "substantial" change was made, but whether the change abandoned or contradicted the organization's "central and well-understood mission." *Moon I*, 129 A.3d at 252

---

[19] The directors cast doubt on this proposition, describing it as a "novel legal theory." But this principle was central to *Moon I*'s holding, and we as a division are not free to revisit it. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court.").

(quoting *Matter of Manhattan Eye, Ear & Throat Hosp. v. Spitzer*, 715 N.Y.S.2d 575, 595 (N.Y. Sup. Ct. 1999)).  It is only when directors abandon their corporate mission, such as by "creat[ing] an entirely different type of corporation . . . to engage in a business entirely different," that they may have breached a fiduciary duty through the amendments alone.  7A Fletcher, *supra*, at § 3718 (2021).

In *Moon I*, we illustrated the point:  "An organization plainly established to promote the preservation of African wildlife and acquiring vast funds on that basis might well be barred from switching its purpose to expenditures on domestic cats and dogs."  129 A.3d at 252.  A change like that would abandon the organization's central mission and put it on an entirely different course.  On the other hand, directors of an organization established to preserve gorillas would not violate their fiduciary duties simply by broadening that mission to include the preservation of other African great apes.  That would "not change the essential character of the business, but" merely "authorize[] its extension" or "enlarge[]" its mission.  7A Fletcher, *supra*, at § 3684 (2021) (quoting *Wright*, 193 U.S. at 664).

The trial court in this case reasoned that neutral principles of law permitted it to conclude that the directors breached their fiduciary duties in amending UCI's articles.  The court invoked the common law of contractual interpretation, *see Bd. of*

*Dirs., Wash. City Orphan Asylum v. Bd. of Trs., Wash. City Orphan Asylum*, 798 A.2d 1068, 1079 n.12 (D.C. 2002), comparing the plain language of the 1980 and amended articles to conclude that the directors' amendments "unmoor[ed]" UCI from its original purposes and that the directors therefore breached their duty. In reaching that conclusion, the court focused on the following two revisions: (1) the directors' decision to nix the term "Unification Church" from the amended articles—replacing two references to the "Unification Church" with a single reference to the "Unification Movement"; and (2) the directors' decision to excise six references to "the Divine Principle" from the amended articles, leaving in their place only a command to "support the understanding and teaching of the theology and principles of the Unification Movement," and another to "disseminate throughout the world[] newspapers, books, tracts, [and] other publications and forms of media" to further UCI's purposes. Appellees also urge us to focus on a third amendment: (3) the directors' decision to strike, in its entirety, the 1980 articles' first-enumerated purpose—"assisting, advising, coordinating, and guiding the activities of Unification Churches . . . throughout the world." We consider each of these changes in turn.

*1. From "Unification Church" to "Unification Movement"*

The crux of the trial court's reasoning was that the amendments "substantially altered UCI's corporate purposes by eliminating any obligation to the Unification Church." It characterized the 1980 articles' repeated references to the Unification Church as "specific denominational references," which "narrowed the means to accomplish [UCI's] corporate purpose." Replacing multiple references to the Unification Church with a single reference to the Unification Movement, in the court's view, "unmoor[ed] UCI's purposes from these specific doctrinal ties," emphasizing "admittedly broad goals at the expense" of its prior obligations to the institutional Church.[20]

---

[20] The trial court emphasized that these amendments were substantial not only in quality but in quantity, finding that "repeated references" to the Unification Church and Divine Principle in the 1980 articles "carried significant . . . and non-duplicative meaning." However, neither appellees nor the court explain how those redundancies bore independent and non-duplicative significance. With the exception of the 1980 articles' call for UCI to promote the "activities of Unification Churches," *see infra* part II.A.3, we see no "significant" or "non-duplicative meaning" conveyed by the repeated use of either term. The repetition of certain terms instead seems to be a means of emphasizing them, in the same way that streamlining the articles and cutting the excess fat might just as well do. If the amended articles wrought a substantial change to UCI's mission, it must be due to their use of distinct terminology, not their failure to repeat that terminology.

The problem with that analysis lies in its premise. There is no neutral principle by which we might arrive at the conclusion that the 1980 articles used the phrase "Unification Church" as a "specific denominational reference[]," as opposed to referencing the broader religious movement. There is no dispute that the term may refer to either or both things. And if it refers to a religion—a set of theological beliefs—then there is no way to determine whether a change-of-phrase from "Unification Church" to "Unification Movement" changed the essential character of UCI's purposes without a deep dive into religious questions. After all, the directors maintain that the two terms are "interchangeable labels, both referring to the same charismatic providential movement" founded by Rev. Moon. In their view, the semantic change in the amended articles is more faithful to Rev. Moon's "end of the church era" pronouncement than the Family Federation's institutional conception of the "Unification Church." Whether the directors are correct on that point is a theological question that we have neither the expertise nor authority to answer.

To be sure, the term "Unification Church" refers not only to a religion, but has also colloquially referred to a variety of institutional actors over the years: HSA, at the time the 1980 articles were drafted; the Family Federation, come the mid-1990s; and "the Unification Church," as Sean briefly renamed the Family Federation in 2009. But upon what neutral principle might we rest the conclusion that the 1980

articles gave primacy to an institutional actor if—as the directors claim—that institutional actor had departed from the religion's core principles? Nobody has offered one, and we can discern none. Likewise, how could we reject through neutral principles the directors' claims that the Family Federation did in fact depart from the religion's core tenets so that fidelity to the religion required breaking from the institution?[21] It is not possible to do so because that is a deeply religious judgment.[22]

To illustrate the point, consider a hypothetical 11th century corporation devoted to supporting the "Christian church" that, after the Great Schism, amends its articles to embrace the "Roman Catholic Church." *See Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 699 (1976) (describing the Great Schism). A court operating within the First Amendment's bounds could never countenance a fiduciary-duty suit by the Patriarch of

---

[21] Indeed, it is particularly unsurprising that UCI would want to dissociate itself from the locution of the "Unification Church" when amending its articles in 2010, as Sean had only months earlier rebranded the Family Federation with that name. If the UCI directors believed their duty was to the Church as a religion, as opposed to that specific institution, it would make sense to semantically disentangle themselves from what was then Sean's branch of the Church.

[22] As for the change to the corporation's name—from Unification Church International to UCI—appellees concede that for decades the entity had been known as UCI. Given that concession, along with all of the additional reasons above, formally changing the name of the organization to conform to common usage could not conceivably amount to an essential change in the organization's mission.

Constantinople based on the premise that Eastern Orthodoxy (not Roman Catholicism) represents the true "Christian church." That would be true even if the Eastern Orthodox branch had come to be known by its followers as "the Christian church" prior to the amendment. Yet that is essentially the type of religious intrusion that the trial court's order here committed.

Importantly, the 1980 articles could have provided some neutral principle by which to resolve such disputes, and thereby avoided this judicial impasse. In fact, the year before the 1980 articles were drafted, the Supreme Court suggested religious entities do just that, and "specify . . . what religious body will determine the ownership in the event of a schism or doctrinal controversy." *See Jones*, 443 U.S. at 603. But the articles never did that. UCI was never made subservient to a particular institutional actor, nor did any institutional actor (except the board itself) have direct authority to control UCI or settle disputes over its assets.

Absent such a neutral mechanism, to say that the revision to "Unification Movement" changed UCI's essential character would require us to adjudicate a dispute over not only the meaning of religious terms, but a longstanding debate about

the very future of the religion.[23] *See Presbyterian Church*, 393 U.S. at 450 (a civil court may not decide whether a religious group "substantial[ly] depart[ed] from the tenets of faith and practice," if doing so would require the court to "make its own interpretation of the meaning of church doctrines") (internal quotations omitted). Injecting ourselves into that dispute would place the District's courts in the untenable position of "inhibiting the free development of religious doctrine." *Id.* at 449. That is not our place.

---

[23] Appellees seek to downplay these stakes, suggesting that so long as the term Unification Church is understood to refer to the church as *some* institution in the abstract, the court need not identify what that institution is, or determine where spiritual authority lies. Even assuming it were possible to thread that needle for First Amendment purposes, that contradicts how the Family Federation framed its claim. The plaintiffs' complaint states that "[t]he Family Federation . . . is the current name for the authoritative religious entity that directs Unification Churches Worldwide" and repeatedly asserts that Preston, in his role at UCI, was an agent of the Family Federation. As for the trial court, its preliminary injunction order described how the "Unification Church" simply refers to the Family Federation—the "spiritual successor to HSA" and the "authoritative religious entity at the head of the Unification Church." The court later reiterated those same descriptions when granting summary judgment in the Family Federation's favor. Those are far from religiously neutral determinations. There is nothing in the record to suggest that the Family Federation ever exercised legal authority over UCI or the other organs of the religion. Moreover, the directors deny even the Family Federation's spiritual authority, maintaining that there is no hierarchical authority in the Unification polity at all. Because a civil court may not wade into ecclesiastical controversies to "ascertain the form of governance adopted by the members of [a] religious association," *Samuel*, 116 A.3d at 1258 (quoting *Jones*, 443 U.S. at 605), let alone "determine the religious leader of a religious institution," *id.* at 1261, the court was not at liberty to make that determination here.

*2. From "Divine Principle" to*
*"Theology and Principles of the Unification Movement"*

The trial court next focused on the directors' excision of the term "the Divine Principle" from the amended articles. Unlike the term "Unification Church," there is no dispute as to the meaning of "the Divine Principle." It refers to a specific theological text written by Rev. Moon that is central to the religion. *See Meshel*, 869 A.2d at 354 (a court may consider religious language where there is no "material dispute between the parties" as to its meaning). The 1980 articles had referenced the Divine Principle six times. Each reference was excised, and the amended articles now articulate a broader purpose "[t]o promote and support the understanding and teaching of the theology and principles of the Unification Movement," and "[t]o publish and disseminate throughout the world, newspapers, books, tracts, other publications and forms of media in order to further the purposes of" UCI.

Those amendments enlarge the category of texts that UCI is to promulgate, but that alone does not necessarily amount to changing the essential character of UCI, or abandoning its central mission. Indeed, the directors agree that the Divine Principle remains a central text of the Unification Movement, but point out that it is only one of Rev. Moon's numerous writings—sometimes called the "Eight Great Texts," substantial portions of which were completed after 1980—that collectively

make up the "canon" of the religion. According to the directors, the broader language in the amended articles is consistent with the original articles because it "capture[s] all of Rev. Moon's teachings, *including* the Divine Principle."

Appellees counter that the Divine Principle, specifically, was fundamental to the original articles, and that replacing that specific term with "vague" references to "theology and principles" and other "books" and "pamphlets" represents the abandonment of one of UCI's central purposes. The flaw with that argument is that nothing in the amended articles precludes or inhibits UCI from continuing to promote the Divine Principle.[24] And we cannot say, without treading into religious questions, that the Divine Principle is so central to the religion that even referring to it only as a part of a broader body of works amounts to heresy or some other fundamental shift. Analogously, we could not say that a Christian church dedicated to teaching "the four gospels" (according to Matthew, Mark, Luke, and John) would fundamentally alter its mission by expanding its purposes to preaching "the gospel" more broadly. It is not for a civil court to determine whether a religion is built around

---

[24] Appellees have not suggested that UCI has, in practice, stopped disseminating the Divine Principle in the years since the amendments were enacted. That might be a valid basis for a breach of fiduciary duty claim, but it is not the claim that appellees have raised.

a single canonical text. And it is not for us to determine the religious significance of Rev. Moon's subsequent works expounding upon the Divine Principle.

### 3. Striking Any Obligation to Assist or Guide "Unification Churches."

Finally, appellees urge us to consider the directors' decision to strike from the 1980 articles the first enumerated purpose of UCI—"assisting, advising, coordinating, and guiding the activities of Unification Churches . . . throughout the world."[25] Appellees argue that the fact that this purpose came first in the 1980 articles means that promoting "brick-and-mortar" churches was UCI's "primary purpose," and that its omission therefore constituted a substantial change.

The directors offer two responses. First, they contend that they did not abandon this purpose because the amended articles' purposes subsume assisting brick-and-mortar churches. In the alternative, they argue that withdrawing support from brick-and-mortar churches (one of five purposes in the 1980 articles) would not be a substantial change at all. As a matter of practice, UCI had never devoted

---

[25] The trial court did not focus on this aspect of the directors' amendments in its order granting summary judgment, though it did reference the change in its remedies order, finding that "the directors understood that the first purpose of the 1980 articles . . . was one of the primary purposes of [UCI]," and that the amendments eliminated that obligation.

substantial resources to brick-and-mortar churches in the decades when it operated under the 1980 articles. For instance, in the thirteen years before Preston became President of UCI—operating under his predecessor, Douglas D.M. Joo, from 1992 to 2005—it is undisputed that UCI directed less than five percent of its disbursements to traditional church entities. Appellees also do not dispute that UCI was compliant with its obligations under the 1980 articles during that stretch.

Once again, we cannot conclude that excising this first purpose of the 1980 articles, whether or not it was fairly subsumed by other purposes in the revised articles, impermissibly changed the essential character of UCI. Determining whether eliminating the articles' first-enumerated purpose was a substantial change would require us to measure the relative significance of UCI's other purposes— including such goals as promoting "the worship of God," supporting an "understanding and teaching of the Divine Principle," and achieving "the interdenominational, interreligious, and international unification of world Christianity and all other religions." That brings us right back to the bar on extensive inquiries into religious doctrine. *See, e.g.*, *Bible Way Church*, 680 A.2d at 427. There is no neutral principle that allows us to say that support for brick-and-mortar churches was so essential to UCI's purposes, contrary to its own historic practices

and Rev. Moon's apparent aspiration to move beyond them, that pivoting away from them marked an essential change in its mission.

**B.**

The trial court also granted summary judgment for appellees on their claim that the directors breached their fiduciary duties when they voted to transfer around half of UCI's assets to KIF and GPF. Those two entities were not affiliated with the Unification Church, as appellees contend they had to be under the 1980 articles.[26] Although the court acknowledged that UCI had a history of making donations to "organizations not officially affiliated with the Unification Church," it distinguished those historical donations on two grounds: (1) that the bulk of those donations were either directly approved by Rev. Moon, or were made to entities that he had established or was affiliated with; and (2) that even if UCI had sometimes donated to organizations that were not affiliated with the Church, the donations to KIF and GPF were different because they were made expressly *because* those organizations

---

[26] The trial court assumed the donations had to comply with UCI's corporate purposes as expressed in the 1980 articles, rather than post-2010 amendments. It is not obvious that is the correct approach, but the directors do not cast doubt upon that assumption, so we too will adopt it. It is ultimately an inconsequential point because, for the reasons above, we could not evaluate the KIF or GPF donations' compatibility with *either* version of the articles in a manner that would be consistent with the First Amendment.

were unaffiliated. Neither distinction is persuasive. We conclude that the trial court exceeded its authority under the First Amendment when it found that the 1980 articles barred the transfers to GPF and KIF, and that the directors breached their fiduciary duties by effecting those transfers.

As an initial matter, both the trial court and the appellees struggle in vain to differentiate the transfers to KIF and GPF from UCI's historical donations to other unaffiliated organizations.[27] Indeed, UCI's history appears to refute the notion that the articles ever prohibited donations to entities unaffiliated with the Unification Church. Long before the directors held their posts, UCI donated tens if not hundreds-of-millions of dollars to a number of unaffiliated, nonsectarian entities, including the Universal Ballet, the University of Bridgeport, and *The Washington Times*. The Universal Ballet disclaimed any "affiliation with . . . the Unification Church," and calls itself "non-sectarian." The University of Bridgeport had no affiliation either, and it too describes itself as "secular," "independent," and

---

[27] If appellees could show—in a manner consistent with the First Amendment—that the donations to KIF and GPF were fundamentally different than UCI's previous donations, that might be persuasive evidence that the transfers violated UCI's original purposes. But the converse is also true, as it stands to reason that if "a long-standing pattern or practice of corporate behavior may give rise to a by-law" where one did not exist, *see Moon I*, 129 A.3d at 251 (citing *Nat'l Confed. of Am. Ethnic Grps. v. Genys*, 457 A.2d 395, 399 (D.C. 1983)), such a pattern or practice could also inform how to best interpret the bylaws that do exist.

"nonsectarian." The "general-purpose" conservative newspaper, *The Washington Times*, likewise operated independently from the Unification Church and espoused no religious ideals. The record also includes evidence of other donations to secular entities, such as a private school in New York attended by Rev. Moon's children, a martial arts organization, several anti-communist organizations, and a firearms manufacturer. It additionally shows a donation to Rev. Jerry Falwell's ministry. Indeed, as the directors point out, there is no language in even UPF's charter to suggest that it had any legal affiliation with the Church that GPF did not.

Appellees concede that those prior donations to unaffiliated organizations were consistent with UCI's corporate purposes. But they attempt to distinguish those transfers, pointing out that "[a]lmost all of the organizations that UCI historically supported were founded by Rev. Moon and/or Mrs. Moon," whereas the transfers to KIF and GPF were made in defiance of Rev. Moon's wishes, because he did not "support[] the creation of and donations to" those organizations. That reasoning exposes the true nature of appellees' claim, the essence of which the trial court adopted: donations approved by Rev. Moon comport with UCI's mission, whereas those approved by Preston (and his co-directors) do not.[28]

---

[28] If Rev. Moon's approval was enough to insulate a given donation from further scrutiny for compliance with the articles, then we see no reason why the

We cannot adopt that reasoning. For one thing, it would require us to decree that the Unification Church is a hierarchical organization, in which the judgments of church leaders carry dispositive weight in church disputes. That is a contested issue of church polity. *See Samuel*, 116 A.3d at 1259 (finding, under analogous facts, that making such a determination "would entail an impermissible inquiry into 'church polity'" (quoting *Jones*, 443 U.S. at 605)). Moreover, even if we assume that the Unification Church is a charismatic religious movement that places a single individual atop its hierarchy, the First Amendment bars us from resolving a dispute as to the identity of that leader. *Id.* at 1261 ("[T]he First Amendment does not permit a civil court to determine the religious leader of a religious institution."). Here, the directors have offered testimony that Rev. Moon's health was fading and that—at the time of the key events in this case—he was being manipulated by others, contrary to his vision for the religion's future. Preston, on the other hand, had been dubbed the "fourth Adam" by his father. He was elected president and chairman of UCI's board of directors. Several of his co-directors testified that, in their view, Preston was the true leader of the religion—even before Rev. Moon's death. We can discern no neutral principle to resolve a dispute as to which party had "spiritual and

---

approval of his rightful successor would not do likewise. That brings the succession fight to the forefront of this dispute, contrary to appellees' protests that it is immaterial to it.

charismatic authority" over the Church and its affiliates at the time the relevant transfers were approved. *See Moon*, 431 F. Supp. 3d at 406 (collecting cases to support the proposition that "intrachurch succession disputes . . . fall squarely within the nonjusticiable category").

But the failure to distinguish the transfers to GPF and KIF from UCI's historical donations is not the only basis on which we depart from the trial court's reasoning. Missing from the court's analysis into those transactions' compatibility with UCI's corporate purposes is any mention of the substance of those purposes. Per the 1980 articles, those purposes include promoting "the worship of God," achieving the "unification of world Christianity and all other religions," and sponsoring cultural, educational, and religious programs "for the purpose of furthering the understanding of the Divine Principle." UCI's stated purposes are plainly broader than merely supporting institutions that are formally affiliated with the Church. And the directors contend that the transfers to GPF were consistent with UCI's purposes because GPF's "peace-building work fulfilled Rev. Moon's providential vision" for the movement, and that the transfer to KIF was consistent with UCI's purposes because it was essential to secure project financing for the Parc1 real estate development, which was necessary to achieve Rev. Moon's "lifelong dream" of developing that plot. The directors further emphasize that KIF

was contractually obligated to support "the theology and principles of the Unification Movement" because the donation agreement contained express language to that end.

The court did not consider the directors' argument that the articles should be interpreted to embody a more "providential vision" of the Church. Nor could it have rejected that argument based on neutral legal principles. To determine which party was correct about the meaning of the 1980 articles—which are steeped in overtly religious language—the court would have needed to adjudicate longstanding debates over the direction of the Church, including whether it is best understood as a denominational institution or an interfaith movement. Such determinations are not permissible under the First Amendment. In short, the trial court erred in finding that UCI's donations to KIF and GPF ran afoul of UCI's corporate purposes.

## III.

Appellants ask us to not only reverse the entry of summary judgment against them, but to direct the trial court to dismiss the breach of fiduciary duty claim altogether. One wrinkle precludes us from doing that. While we agree that the two theories of fiduciary breach embraced by the trial court are non-justiciable, there remains a third theory advanced by the appellees that the trial court did not address:

that the directors engaged in self-dealing. The complaint averred, as a subpart of the breach of fiduciary duty claim, that Preston and the directors engaged "in a scheme of self-dealing designed to divert corporate assets to the personal pursuits of Preston." That theory may yet have some legs, provided there is evidence to support it.

While religious abstention is a robust doctrine that provides substantial protections to religious organizations' autonomy within the religious sphere, the Supreme Court has strongly suggested that there is a "fraud or collusion" "exception to the general rule of non-interference," under which a civil court may decide a facially ecclesiastical dispute when religious figures "act in bad faith for secular purposes." *Heard*, 810 A.2d at 881 (citing *Milivojevich*, 426 U.S. at 713).[29] Under that potential exception, a civil court may have the authority to exercise "marginal" review, even where a dispute implicates ecclesiastical matters. *Id*. This "fraud or collusion" exception, "if [it] exists, . . . would apply where a religious entity" or figurehead "engaged in a bad faith attempt to conceal a secular act behind a religious smokescreen." *Moon v. Moon*, 833 F. App'x at 880. Although it would surely be

---

[29] The Supreme Court has never definitively endorsed the exception. *See Hutchinson v. Thomas*, 789 F.2d 392, 395 (6th Cir. 1986), *cert. denied*, 479 U.S. 885 (1986); *Moon v. Moon*, 833 F. App'x at 880, *cert. denied*, 2021 WL 2405175 (U.S. June 14, 2021). Nor, for that matter, have we. *See Heard*, 810 A.2d at 881.

difficult to disentangle a charge of self-dealing from religious questions when brought against somebody with a claim to messianic status, we need not confront that difficulty today.

The parties have not briefed the legal issue of whether there is a fraud or corruption exception to the religious abstention doctrine, nor have they explained what evidence (or lack thereof) underlies the self-dealing claim, nor have they even discussed whether that claim remains live at this stage of the proceedings in the trial court. Those are all matters we leave the trial court to address in the first instance on remand.

**IV.**

The trial court erred in awarding appellees summary judgment on their breach of fiduciary duty claims. Mistakenly holding that it could adjudicate those claims via neutral principles of law, the court repeatedly resolved ecclesiastical disputes. We therefore reverse and vacate the trial court's grant of summary judgment, and vacate its ensuing remedies order. We stop short of directing summary judgment in the directors' favor on the fiduciary duty claims, however. Appellees have alleged what amounts to a claim of fraud and/or collusion, which may yet be a justiciable

claim that does not require delving into religious questions, and the trial court may consider it on remand if appropriate.

The orders of the trial court are reversed. We remand the case for further proceedings consistent with this opinion.

*So ordered*.